Cathy STROZINSKY, Plaintiff-Appellant,

v.

SCHOOL DISTRICT OF BROWN DEER, Defendant-
Respondent-Petitioner.

Supreme Court

*No. 98–0454. Oral argument March 2, 2000.—Decided July
12, 2000.*

## 2000 WI 97

(Also reported in 614 N.W.2d 443.)

20

21

For the defendant-respondent-petitioner, there were briefs by *M. Elizabeth O'Neill* and *Whyte Hirschboeck Dudek, S.C.*, Milwaukee, and oral argument by *M. Elizabeth O'Neill.*

For the plaintiff-appellant, there was a brief by *Alan C. Olson, Robert M. Mihelich* and *Alan C. Olson & Associates, S.C.*, New Berlin, and oral argument by *Alan C. Olson.*

¶ 1. DAVID T. PROSSER, J. The School District of Brown Deer (the District) seeks review of an unpublished decision of the court of appeals.[1] The court of appeals reversed a decision of the Circuit Court for Milwaukee County, John F. Foley, Judge. The circuit court granted summary judgment to the District, holding that the wrongful discharge claim of Cathy Strozinsky (Strozinsky) was not actionable because Strozinsky did not satisfy the public policy exception to the employment-at-will doctrine. The circuit court, however, urged Strozinsky to proceed on an alternative theory, constructive discharge.

¶ 2. Strozinsky resigned from her position as payroll clerk in the District's central office after she and her supervisors disagreed about the tax withholdings from a bonus check. Strozinsky filed a wrongful

---

[1] *Strozinsky v. School Dist. of Brown Deer*, No. 98–0454, unpublished slip opinion (Wis. Ct. App. May 18, 1999) (per curiam).

discharge claim, contending that the District had forced her to resign because of her efforts to comply with the public policy reflected in Wis. Stat. § 943.39[2] and federal tax laws.

¶ 3. After the circuit court granted summary judgment to the District, Strozinsky submitted a motion for reconsideration. The circuit court, Christopher R. Foley, Judge, denied the motion for the wrongful discharge claim. The court also found that Strozinsky could not pursue a constructive discharge claim because constructive discharge is not actionable as a distinct cause of action and offers relief only when raised in conjunction with an underlying theory of recovery. The court therefore granted the District's motion to dismiss the case.

¶ 4. The court of appeals reversed. The court did not expressly address whether the constructive discharge doctrine applies to common-law claims filed under the narrow public policy exception to the rule of employment-at-will established in *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 335 N.W.2d 834 (1983). The court applied the doctrine, holding that a jury should decide the question "whether the conditions at Strozinsky's workplace were so intolerable that a reasonable person would be forced to resign." *Strozinsky v. School Dist. of Brown Deer*, No. 98–0454, unpublished slip opinion at 8 (Wis. Ct. App. May 18, 1999) (per curiam). The court also found that Strozinsky set forth questions of fact about whether her attempts to comply with the Internal Revenue Code created intolerable working conditions that triggered a discharge in violation of public policy. *Id.*

---

[2] All references to the Wisconsin Statutes are to the 1993–94 volumes unless indicated otherwise.

¶ 5. We frame two issues in this case. First, we address whether Strozinsky identified a fundamental and well defined public policy sufficient to meet the narrow cause of action for wrongful discharge under the public policy exception to the general rule of employment-at-will first recognized by this court in *Brockmeyer*, 113 Wis. 2d 561. Second, we consider whether the constructive discharge doctrine applies to a common-law claim for wrongful discharge under the same exception.

¶ 6. We hold that the wrongful discharge claim is actionable under the narrow public policy exception to the employment-at-will doctrine because Strozinsky identified a fundamental and well defined public policy in the provisions of Wis. Stat. § 943.39(1) and 26 U.S.C. §§ 3101, 3102, and 6672(a). The granting of the District's summary judgment motion was therefore inappropriate. Our approach to this first issue differs from that of the court of appeals because we conclude that whether a plaintiff identifies a public policy is a question of law to be decided by the court, not a jury. For the second issue, we agree with the circuit court inasmuch as the constructive discharge doctrine does not present an independent cause of action. We hold, however, that the doctrine of constructive discharge can be applied as a defense in a common-law claim under the public policy exception because some resignations are, in fact, involuntary. In this case a question of fact exists under the constructive discharge standard, namely whether Strozinsky's working conditions were so intolerable that a reasonable person in her position would have been compelled to resign. We agree with the court of appeals that this question requires resolution by a jury, and hence, we conclude that the District's motion to dismiss the case should not have

27

been granted. Accordingly, we affirm the decision of the court of appeals and remand the cause to the circuit court for trial for determination whether Strozinsky's resignation was a constructive discharge and, if so, whether the discharge violated public policy.

## FACTS

¶ 7. Strozinsky presented the following facts.[3] The District employed Strozinsky as a payroll clerk from approximately January 11, 1988, until September 30, 1995. Strozinsky was responsible for bookkeeping and payroll duties, and she determined the federal and state tax withholdings for all payroll checks issued to District employees. Among the employees for whom Strozinsky computed withholding tax was the District Superintendent, Kenneth Moe (Moe). Strozinsky reported directly to the District's Business Manager, Donald Amundson (Amundson), an immediate subordinate of Moe.

¶ 8. Under his employment contract with the District, Moe received an annual bonus equal to 10 percent of his salary. The check was issued directly into a tax-sheltered annuity account that Moe selected. Before 1993, the District had paid the bonus to the annuity account without withholding any Social Security or Medicare taxes from the gross amount. Strozinsky did not recall whether she or someone else

---

[3] In a review of a summary judgment motion, this court interprets the facts, and all reasonable inferences drawn from those facts, in favor of the nonmoving party. *See Grams v. Boss*, 97 Wis. 2d 332, 338–39, 294 N.W.2d 473 (1980). When reviewing a motion to dismiss, we assume that the facts as set forth in the complaint are true. *Hausman v. St. Croix Care Ctr.*, 214 Wis. 2d 655, 662, 571 N.W.2d 393 (1997); *Wandry v. Bull's Eye Credit Union*, 129 Wis. 2d 37, 39, 384 N.W.2d 325 (1986).

prepared those checks; issuance of the bonuses had not always been within her area of responsibility.

¶ 9. Strozinsky did remember the bonus check paid to Moe in July 1994. No taxes were withheld from that check, and Amundson instructed Strozinsky not to make any adjustments to offset the difference in the two regular paychecks issued to Moe subsequently that month. Strozinsky recalled Amundson telling her "not [to] tax Mr. Moe that high." Although Strozinsky was not comfortable, she prepared the paycheck as Amundson directed and did nothing to verify whether her actions were legal or not. *Id.*

¶ 10. Strozinsky described an atmosphere at the District's business office in which the payroll staff was ill at ease with procedures that were not "legally correct." A previous bookkeeper, for instance, refused to sign off on federal tax forms she issued because they were not truthful. The bookkeeper feared she might be held personally liable for falsified information. *Id.* Another employee also refused to sign tax documents, testifying that the materials accompanying Moe's tax-sheltered annuity were fraudulent. Strozinsky herself had learned from her membership in the American Payroll Association that she could be held liable for errors in payroll checks.

¶ 11. The following year, Strozinsky issued Moe's annual bonus check on July 7, 1995. She drew the $9,149 bonus from the District's accounts payable checking account and submitted it to Moe's annuity account. Since issuing the 1994 paycheck without the withholdings, Strozinsky had become more informed about taxation procedures from the American Payroll Association and seminars she attended. She therefore believed tax should be withheld from the bonus check, but she was unable to deduct the amount because the

District's computer software was not equipped to execute the withholding from the accounts payable account. Strozinsky therefore made an adjustment to offset the necessary withholding in Moe's next regular payroll check. She did not give Moe any advanced explanation that he would be receiving a reduced net amount on the paycheck. After Strozinsky deducted this additional amount, Moe's payroll check was about $500 less than he expected.

¶ 12. Moe received this reduced paycheck on July 20, 1995, and that same day he confronted Strozinsky about the large deductions. Strozinsky explained that she "was going to tax it properly" and wanted it "done correctly in regards to taxes and with Wisconsin Retirement." She said the tax laws required her to make withholdings from the bonus check, and she therefore had deducted the required amount from the regular paycheck. Moe allegedly told her that he "didn't care" and instructed Strozinsky that he did not want his payroll check to reflect any withholding to compensate for the annual bonus payment. During this conversation, Strozinsky found Moe assertive and "threatening in his demeanor." She testified at her deposition that Moe threw the check across the desk at Strozinsky and demanded that she change it. Strozinsky felt as if she were "being chastised like a child gets yelled at."

¶ 13. After this conversation, Strozinsky called the Internal Revenue Service (IRS) for advice. The IRS representative confirmed that tax should be withheld from the bonus payment, explaining that the deduction Strozinsky made was withheld properly from Moe's next regular paycheck. Strozinsky testified that the representative suggested that Moe himself should contact the IRS directly rather than arguing with

Strozinsky about the withholding. The IRS allegedly told Strozinsky that she personally could be liable for the amount owed as well as a penalty and compounded interest.

¶ 14. Strozinsky conveyed the information she had received from the IRS to her supervisor, Amundson. She explained that she faced personal liability for any unpaid taxes, plus penalties and interest. Amundson nonetheless directed Strozinsky to re-issue a new payroll check to Moe, this time without any tax withholdings deducted, neither for the bonus nor the regular payroll amount. Amundson remarked, "This only happens once a year, just do it and get it over with and eventually he will make it up."

¶ 15. Strozinsky agreed to prepare the check if Amundson signed a written statement releasing her from liability in the event the IRS challenged the non-reporting. Strozinsky recalled that Amundson told her that he would take full responsibility, and he signed the statement. Strozinsky voided the check with the proper withholdings and prepared a new payroll check that withheld no taxes.

¶ 16. Moe received the replacement check, but Amundson returned it to Strozinsky. He informed Strozinsky that without any tax withheld, Moe thought the error may look too obvious and explained that Moe wanted her to issue a third check, this time with partial withholdings. When Strozinsky told Amundson that the District computer software prevented her from manipulating the software to change the withholding percentages, Amundson told her "to find a way to do it in the system." Strozinsky made repeated, unsuccessful attempts to issue the check.

¶ 17. As Strozinsky and Amundson struggled with the computer software, Moe approached Amund-

son and Strozinsky and conceded that he was required to pay the taxes that Strozinsky originally had withheld. Moe, however, addressed Strozinsky's decision to ask Amundson to sign the statement insulating her from potential liability, stating, "I'm offended by this memo [that you] documented something, and that you [ ] impl[ied] that I'm doing something illegal here when I'm not." Moe screamed as his veins bulged and spittle came out of his mouth. Strozinsky stated that Moe leaned over the desk red-faced, pointed to the door, and warned that if Strozinsky engaged in similar behavior in the future, she would be "out of here." Strozinsky attempted to justify her conduct; Moe told her, "It was your responsibility—It's your responsibility to advise me about tax." During this exchange, Amundson told Strozinsky to be quiet and not say anything else to Moe. Strozinsky conceded that before July 1995, she and Moe had had "a very good working relationship."

¶ 18. Strozinsky explained that this incident left her shaken. She cried, hyperventilated, and vomited. She told Amundson, "I cannot do this anymore. I cannot work here anymore." Amundson told Strozinsky to calm down and that she should then issue yet another payroll check, this time again with the full amount deducted as an adjustment for the withholding amount required from the bonus check. Strozinsky testified at her deposition that Amundson said, "what happened to [you] was terrible and it shouldn't have happened, but you know that he's not going to apologize to you. You know he'll never admit he's wrong." Amundson urged her not to quit.

¶ 19. Strozinsky nonetheless feared she would lose her job and decided that "nobody was worth breaking the law for." She submitted a written complaint to Karen Rutt, the District's Human Resources Manager,

asserting that Moe's treatment was demeaning, upsetting, and amounted to a "form of harassment." She provided a copy of the complaint to Amundson, who inquired, "Are you sure you want to do this? You know what he gets like. You're talking about the superintendent here." Amundson instructed Rutt to take no immediate action on the complaint until after Strozinsky took a pre-planned family vacation scheduled for the following week.

¶ 20. When Strozinsky returned to work on August 2, 1995, Amundson handed the written complaint back to her, explaining that he would "pretend [he had] never s[een] it." Strozinsky told Amundson that whenever she saw Moe, her "stomach flipp[ed]" and she grew shaky. Amundson wrote this off to "a typical reaction that females have."

¶ 21. Moe, Amundson, and Strozinsky met the next day. Moe underscored that he and Amundson were Strozinsky's bosses, and that as a "payroll clerk," she had no authority or power. Strozinsky told the men she had tried to fulfill her job duties lawfully, following the advice she had received from the IRS and the information she had learned from the American Payroll Association. Moreover, she explained that she had asked Amundson to sign the written release because she did not trust Moe or Amundson to "back her up" in any dispute with the IRS. Moe replied that he and Amundson were the parties responsible, adding that "if [we] get caught that's why [the District] [has] errors and omissions insurance." Moe stated that if Strozinsky did not trust him, she should not work for him.

¶ 22. After August 3, Amundson and Moe excluded Strozinsky from job duties in which she regularly participated previously, such as work on short-term borrowing projects and attending the orientation

designed to introduce and explain payroll benefits to new District teachers. Amundson ceased working with Strozinsky as he had in the past. She sensed that Moe and Amundson stopped communicating with her, reprimanded her without cause, and pressured her with rushed deadlines. Strozinsky felt threatened and believed that Moe was presenting her with "an ultimatum."

¶ 23. On September 13, 1995, Strozinsky spoke with Amundson about the workplace pressures. Amundson suggested Moe was the source of her unease and remarked "if this is what you think pressure is, you're working for the wrong guy, and perhaps you shouldn't be working here." Later that day, Strozinsky submitted a written resignation stating that she would terminate her employment effective September 29, 1995.

## PROCEDURAL HISTORY

¶ 24. After her resignation, Strozinsky filed for unemployment compensation benefits, and the District challenged her application. After a three-day hearing conducted early in 1996, an administrative law judge found "good cause attributable to the employer" as the source of Strozinsky's departure. The tribunal found it irrelevant whether Strozinsky was correct in her interpretation of the payroll tax laws. The judge reasoned that the cumulative effect of the facts suggested that Strozinsky was subjected to unreasonable treatment.

¶ 25. The District appealed the decision to the Labor and Industry Review Commission (LIRC), and that commission affirmed the decision of the administrative law judge. LIRC concluded that Strozinsky "presented testimony that the pressure of the workplace became so severe that she was forced to quit."

LIRC reasoned that "requesting, suggesting, or directing an employe to violate Federal or State law is good cause" to quit.

¶ 26. Strozinsky filed a complaint against the District in Milwaukee County Court on June 12, 1996, alleging wrongful discharge in violation of the public policy mandate articulated in Wis. Stat. § 943.39 (1993–94).[4] The District moved for summary judgment on the grounds that Strozinsky failed to present any evidence that the District had violated a public policy, failed to allege that she refused to violate a public policy, and resigned from her position voluntarily. In addition, the District argued that even if a claim for wrongful discharge could be based on constructive discharge, Strozinsky could not demonstrate that her working conditions were so intolerable that a reasonable person faced with similar circumstances would be compelled to resign.

---

[4] Wisconsin Stat. § 943.39 provides:

**Fraudulent writings.** Whoever, with intent to injure or defraud, does any of the following is guilty of a Class D felony:

(1) Being a director, officer, manager, agent or employee of any corporation or limited liability company falsifies any record, account or other document belonging to that corporation or limited liability company by alteration, false entry or omission, or makes, circulates or publishes any written statement regarding the corporation or limited liability company which he or she knows is false.

The District argues that, "The public policy exception embodied in this statute is only arguably applicable to the present case because the District is neither a 'corporation' nor a 'limited liability company,' as those terms are defined in the Wisconsin statutes." Petitioner's Brief at 29 n.1. In paragraph 2 of her complaint, Strozinsky alleged that the District "is a corporation organized and existing under the laws of the State of Wisconsin." In its answer, the District admitted to this allegation.

¶ 27. On May 21, 1997, the circuit court entered an order granting summary judgment to the District on the wrongful discharge claim. The court found that Strozinsky had not demonstrated that her case satisfied any of the public policy exceptions to the employment-at-will doctrine. The court's order, however, permitted Strozinsky to proceed on an alternative theory, constructive discharge. The court reasoned:

> It's my view that there is certainly an issue of fact with regard to the constructive discharge. If that hasn't been raised, you ought to do that. Because I really think that what she says is true, conditions were intolerable. It's beyond the administration of the school district acting like that. Who the hell does this guy think he is anyway? I think the issue here is a matter of foregoing the constructive discharge. But the motion for summary judgment is granted.

¶ 28. Strozinsky filed a motion for reconsideration of the summary judgment order on June 6, 1997, seeking reversal of the court's decision about the wrongful discharge claim. The motion sought clarification about the constructive discharge claim, noting that Wisconsin law recognizes no such cause of action.

¶ 29. The circuit court denied Strozinsky's motion for reconsideration of the wrongful discharge claim. The District then moved to dismiss the remaining cause of action, constructive discharge. The District argued that constructive discharge presents a basis for recovery only when set forth in conjunction with an underlying cause of action. Strozinsky agreed that she would be unable to proceed on a free-standing claim of constructive discharge without the reinstatement of her original cause of action, wrongful discharge. The

court therefore dismissed the constructive discharge claim without prejudice.

¶ 30. Strozinsky appealed. The court of appeals held that summary judgment was inappropriate because Strozinsky presented genuine issues of material fact about whether she had been constructively discharged. The court of appeals applied the doctrine of constructive discharge without expressly deciding whether Wisconsin recognizes the doctrine in common-law, as opposed to statutory, claims. The court concluded that a jury should determine whether Strozinsky's working conditions were so intolerable that a reasonable person in her position would have resigned. In addition, the court reasoned that material facts were in dispute about whether the "discharge" violated public policy.

## PUBLIC POLICY EXCEPTION

¶ 31. The first issue in this case, whether the claim identified a fundamental and well defined public policy sufficient to meet the narrow cause of action for wrongful discharge under the public policy exception to the doctrine of employment-at-will, presents a question of law that we review independently. *Kempfer v. Automated Finishing Inc.*, 211 Wis. 2d 100, 107–08, 564 N.W.2d 692 (1997).

¶ 32. This issue also requires us to review the decision of the circuit court to grant the District's summary judgment motion. This court analyzes summary judgment motions *de novo*, applying the same methodology as the circuit court. *Tatge v. Chambers & Owen*, 219 Wis. 2d 99, 110, 579 N.W.2d 217 (1998). Summary judgment is appropriate only when there are no genu-

ine facts in dispute and the moving party is entitled to judgment as a matter of law. Wis. Stat. § 802.08(2). In its review of a summary judgment motion, this court construes the facts and all reasonable inferences in the nonmoving party's favor. *Grams v. Boss*, 97 Wis. 2d 332, 338–39, 294 N.W.2d 473 (1980).

¶ 33. We begin by setting forth our established approach to employment relationships. Wisconsin, like many states, adheres to the doctrine of employment-at-will. The doctrine provides that when the terms of employment are indefinite, the "employer may discharge an employee 'for good cause, for no cause, or even for cause morally wrong, without being thereby guilty of legal wrong.'" *Tatge*, 219 Wis. 2d at 112–13 (quoting *Brockmeyer*, 113 Wis. 2d at 567). Generally, at-will employees cannot pursue legal claims stemming from routine dissatisfactions with the terms and conditions of employment or an employer's unjustified decision to terminate the employment relationship. *Brockmeyer*, 113 Wis. 2d at 574. Courts will not second guess employment or business decisions, even when those decisions appear ill-advised or unfortunate. This common-law doctrine has been a stable fixture of our law since 1871. *Tatge*, 219 Wis. 2d at 112.

¶ 34. Over time, federal and state laws refined the complexion of the common-law doctrine. These statutory modifications to the rule of employment-at-will targeted the potentially harsh application of the doctrine by allowing employees to seek relief for certain types of terminations. *Brockmeyer*, 113 Wis. 2d at 567–68. For instance, Title VII of the Civil Rights Act of 1964[5]—and the Wisconsin Fair Employment Act (WFEA)[6]—prohibit employers from using discrimina-

---

[5] 42 U.S.C. § 2000(e)–2 (1976).

[6] Wisconsin Stat. §§ 111.31–111.395.

tory factors such as race, color, religion, sex, or national origin as the basis for discharging an employee. Other statutes make it unlawful for employers to terminate workers because of participation in union activities, jury service, military service, or testifying at an occupational, safety, and health proceeding. *Id.*

¶ 35. Although modifications to the doctrine most often are the product of legislative enactments, occasionally courts also adopt exceptions to the rule of employment-at-will.[7] In 1983, the *Brockmeyer* court observed that statutory modifications do not always protect wrongfully discharged employees. *Id.* at 568. Some employees, for instance, lack the safeguards of collective bargaining agreements and civil service regulations. *Id.* We therefore formulated a narrow exception to the employment-at-will doctrine, recognizing that certain terminations are unjust. *Hausman v. St. Croix Care Ctr.*, 214 Wis. 2d 655, 663, 571 N.W.2d 393 (1997).

¶ 36. The *Brockmeyer* court recognized a narrow public policy exception that allows a cause of action "for wrongful discharge when the discharge is contrary to a fundamental and well defined public policy as evidenced by existing law." *Brockmeyer*, 113 Wis. 2d at 572–73.[8] This exception properly balances the need to

---

[7] *See* Michael D. Moberly & Carolann E. Doran, *The Nose of the Camel: Extending the Public Policy Exception Beyond the Wrongful Discharge Context*, 13 Lab. Law. 371, 371–74 (1997).

[8] In *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 575–76, 335 N.W.2d 834 (1983), we also concluded that causes of action arising from wrongful discharges sound in contract, not tort: "The contract action is essentially predicated on the breach of an implied provision that an employer will not discharge an employee for refusing to perform an act that violates a clear mandate of public policy."

protect employees from terminations that contradict public policy with the employer's historical discretion to discharge employees under the freedom to contract embodied in the at-will doctrine. *Bushko v. Miller Brewing Co.*, 134 Wis. 2d 136, 148, 396 N.W.2d 167 (1986) (Abrahamson, J., concurring). Our acceptance of this public policy exception mirrored the approach taken by sister courts in other states.[9]

¶ 37. Plaintiffs seeking relief under this narrow exception must: (1) first identify a fundamental and well defined public policy in their complaint sufficient to trigger the exception to the employment-at-will doctrine; and (2) then demonstrate that the discharge violated that fundamental and well defined public policy.[10] *Winkelman v. Beloit Mem'l Hosp.*, 168 Wis. 2d 12,

---

[9] *See Wandry*, 129 Wis. 2d at 40 n.2.

[10] The *Brockmeyer* decision articulated four guidelines that gauge whether a discharge violates public policy:

1. An employer is liable for wrongful discharge if it discharges an employee for refusing to violate a constitutional or statutory provision. Employers will be held liable for those terminations that effectuate an unlawful end.

2. The discharge must clearly contravene the public welfare and gravely violate paramount requirements of public interest.

3. An employer is liable for wrongful discharge if the employer discharges an employee for conduct that is "consistent with a clear and compelling public policy."

4. An employer is not liable for wrongful discharge merely because the employee's conduct precipitating the discharge was praiseworthy or the public derived some benefit from it.

*Wandry*, 129 Wis. 2d at 42–43 (citing *Brockmeyer*, 113 Wis. 2d at 573–74).

Over time, the first of the *Brockmeyer* guidelines emerged as the key factor in the termination analysis. Current case law

24, 483 N.W.2d 211 (1992); *Wandry v. Bull's Eye Credit Union*, 129 Wis. 2d 37, 41–42, 384 N.W.2d 325 (1986). Once the plaintiff satisfies these first two steps, the

---

requires discharged employees to show that the termination resulted from a refusal to violate public policy as established by existing law. *Tatge v. Chambers & Owen, Inc.*, 219 Wis. 2d 99, 113–14, 579 N.W.2d 217 (1998); *Hausman*, 214 Wis. 2d at 664–65; *Kempfer v. Automated Finishing, Inc.*, 211 Wis. 2d 100, 109, 564 N.W.2d 692 (1997); *Bushko v. Miller Brewing Co.*, 134 Wis. 2d 136, 142, 396 N.W.2d 167 (1986); *but see Schultz v. Production Stamping Corp.*, 148 Wis. 2d 17, 28, 434 N.W.2d 780 (1989) (Abrahamson, J., concurring); *Bushko*, 134 Wis. 2d at 147–151 (Abrahamson, J., concurring).

Because our decision today does not require us to determine whether Strozinsky's discharge violated fundamental and well defined public policy, we do not add to this standing analysis except to note that courts generally find wrongful discharge when an employer terminates an employee for refusing to commit an illegal act. *See Brockmeyer*, 113 Wis. 2d at 570 n.10 (collecting cases); *see also Peterson v. Browning*, 832 P.2d 1280, 1281–82 (Utah 1992) (employee terminated for refusing to falsify tax and customs documents); *Sterling Drug, Inc. v. Oxford*, 743 S.W.2d 380 (Ark. 1988) (collecting cases); *Smith v. Brown-Forman Distillers Corp.*, 196 Cal. App. 3d 503 (Cal. Ct. App. 1987) (employee refused to continue to participate in illegal handling and pricing at liquor store); *Bowman v. State Bank of Keysville*, 331 S.E.2d 797 (Va. 1985) (employee refused to violate securities and corporation laws); *Tameny v. Atlantic Richfield Co.*, 610 P.2d 1330, 1337 (Cal. 1980) (employee refused to participate in illegal price fixing; court held that "an employer's authority over its employees does not include the right to demand that the employee commit a criminal act to further its interests"); *Harless v. First Nat'l Bank in Fairmont*, 246 S.E.2d 270 (W. Va. 1978) (employee refused to violate federal and state consumer protection laws); Eric W. Schulze, *Constructive Discharge of School Employees*, 118 Ed. Law Rep. 805 (1997); Thomas L. Cluff, Jr., Comment, *In Defense of a*

burden shifts to the employer to show that the discharge actually was sparked by just cause. *Winkelman*, 168 Wis. 2d at 24.

¶ 38. In the years since deciding *Brockmeyer*, this court has emphasized that the public policy factors that give rise to an actionable claim under the exception remain very narrow. *See Tatge*, 219 Wis. 2d at 115 (collecting cases). Public policy considerations invariably are vague and beg judicial caution. *Wandry*, 129 Wis. 2d at 42 (citing *Brockmeyer*, 113 Wis. 2d at 573). We therefore have been careful to require "discharged employees [to] allege a clear expression of public policy." *Id.* (quoting *Brockmeyer*, 113 Wis. 2d at 574).

¶ 39. The clear public policy at issue must be "evidenced by existing law." *Brockmeyer*, 113 Wis. 2d at 572–73. Under *Brockmeyer*, we originally limited the applicable "existing law" to constitutional or statutory provisions. *Id.* at 576. Subsequently, we observed that some, although not all, administrative rules evidence a fundamental and well defined public policy. *Winkelman*, 168 Wis. 2d at 24. Despite our extension of the public policy exception to some administrative rules, we warned that not every statutory, constitutional, or administrative provision invariably sets forth a clear mandate of public policy. *Kempfer*, 211 Wis. 2d at 112. We therefore do not restrict public policy determinations "to the literal language" of the provision or the circumstances it describes. *Bushko*, 134 Wis. 2d at 148 (Abrahamson, J., concurring) (citing *Wandry*, 129 Wis. 2d at 42). Instead, we look to the content of the particular provision to determine whether it implicates a

*Narrow Public Policy Exception of the Employment at Will Rule*, 16 Miss. C. L. Rev. 437, 449–50 (1996).

fundamental and well defined public policy. *Winkelman*, 168 Wis. 2d at 24. Under this approach, we examine whether the employer invoked the power to discharge to contravene the "spirit as well as the letter" of a constitutional, statutory, or administrative provision. *Id.* at 21 (citing *Wandry*, 129 Wis. 2d at 49); *see also Hausman*, 214 Wis. 2d at 664; *Tatge* 219 Wis. 2d at 113.

¶ 40. Several cases illustrate how we recognize a provision that articulates a clear mandate of public policy. In *Hausman*, 214 Wis. 2d at 667–68, this court discerned a well defined public policy of protecting nursing home residents and applied the public policy exception to at-will employees who are discharged after they report abuse or neglect.[11] We modified the *Brockmeyer* exception only after concluding that Wis. Stat. § 940.295(3) imposes an affirmative, legal obligation to report abuse or neglect. *Id.* at 667. The statute also subjects those who do not comply with this obligation to criminal penalties. *Id.* We recognized that strict adherence to employment-at-will would produce an unjustly harsh result. Without the public policy exception, employees would carry "the onerous burden of choosing between equally destructive alternatives: report and be terminated, or fail to report and be prosecuted." *Id.* at 669.

¶ 41. Similarly, in *Kempfer*, 211 Wis. 2d at 106, this court found that a truck driver who refused his employer's command to operate his vehicle without a valid drivers' license alleged a fundamental and well defined public policy. The statutory provision that sets forth the requirements for operating a commercial vehicle, Wis. Stat. § 343.05(2)(a), obligates drivers to

---

[11] In *Hausman*, 214 Wis. 2d at 667, this court explicitly declined to adopt a more sweeping "whistle-blower exception."

43

hold a valid license. *Id.* at 113 n.2. Moreover, Wis. Stat. § 343.245 exposes both the driver and the employer to fines or incarceration for failing to comply with the licensing requirements. *Id.* at 113–14. These statutes, we reasoned, reflect the fundamental and well defined public policy of promoting highway safety. *Id.* at 114. Not unlike the *Hausman* case, the *Kempfer* decision implicitly showed that the truck driver confronted the equally destructive alternatives of termination or statutory penalties.

¶ 42. In *Winkelman,* 168 Wis. 2d 12, we held that a discharged nurse identified a well defined public policy, namely protecting patients from negligent nurses, in an administrative rule that prohibits nurses from performing services for which they are not qualified. The *Winkelman* plaintiff resigned after she declined to obey the employer hospital's instruction that she "float" from her regular duties on the maternity ward to a department for which she lacked training. *Id.* at 16–18. This court observed that Wis. Admin. Code § N 7.03(1) establishes a policy that only qualified nurses should render services. *Id.* at 23–25. Moreover, the provision made it negligent for a nurse to "[e]xecut[e] an order which the registrant or licensee knew or should have known would harm or present the likelihood of harm to a patient." *Id.* at 18 n.2. In effect, *Winkelman* also illustrated how the employee faced the dilemma of choosing between termination for refusing to "float" or facing civil liability in a negligence claim.

¶ 43. The *Wandry* decision, 129 Wis. 2d at 46–47, demonstrated that a discharge can violate the spirit, if not the exact letter, of a statutory provision. *See also Bushko,* 134 Wis. 2d at 144. A credit union terminated the *Wandry* employee after she refused to reimburse the employer for the losses resulting from a forged

check. *Wandry*, 129 Wis. 2d at 39. As part of her wrong-ful discharge claim, the employee identified Wis. Stat. § 103.455 (1983–84) as a well defined public policy.[12] *Id.* at 43. Although this court noted that the statute "does not specifically prohibit an employer from seek-ing reimbursement from an employee for a work-related loss," *id.* at 44, we reasoned that the provision implicitly aims to prevent employers from invoking their coercive economic powers "to shift the burden of a work related loss from the employer to the employee" when the loss occurs through no fault of the employee. *Id.* at 45–46. Even though the statute did not threaten the discharged employee with any criminal or civil pen-alties, we nonetheless concluded that a provision designed to "proscrib[e] economic coercion" evidences a fundamental and well defined public policy within the meaning of the *Brockmeyer* exception. *Id.* at 47.

¶ 44. Other cases reveal which terminations do not implicate a fundamental and well defined public policy. The termination of an employee for failure to sign a nondisclosure and noncompete agreement does not give rise to a cause of action for wrongful discharge under the public policy exception. *Tatge*, 219 Wis. 2d at 115–16. In *Tatge*, we reasoned that the statutory provi-sion that addresses noncompete agreements, Wis. Stat. § 103.465 (1991–92), safeguards employees "from com-pliance with the terms of an 'unreasonable' restrictive covenant." *Id.* at 116. The statute cannot convey a clear mandate of public policy because the "reasonableness" of particular agreements varies from case to case. *Id.* at 116–17.

---

[12] Section "103.445 prohibits an employer from deducting certain work-related losses from an employee's wages without following certain procedures to establish the responsibility for the loss." *Wandry*, 129 Wis. 2d at 44.

¶ 45. In *Schultz v. Production Stamping Corp.*, 148 Wis. 2d 17, 23, 434 N.W.2d 780 (1989), we held that no fundamental and well defined public policy obligates employers to disclose the details of a simplified employment pension plan before requiring at-will employees to join the plan as a condition of employment. We reasoned that neither federal nor state provisions explicitly or implicitly require employers to make such disclosures. *Id.* at 25–26. On the contrary, a federal statute indicated that employers need not provide the information until after an employee's participation in the pension plan began. *Id.* at 24.

¶ 46. In *Bushko*, 134 Wis. 2d at 138–39, an at-will employee alleged that he was terminated because he behaved in a manner that promoted the public interest, namely, complaining about plant safety, hazardous waste disposal procedures, and record falsification. The *Bushko* court held that conduct merely consistent with public policy provides no basis for a wrongful discharge cause of action. *Id.* at 142. Rather, to sustain a claim under the exception, the plaintiff must show that the employer required him or her to violate a constitutional or statutory provision. *Id.* at 142–43.

¶ 47. To sum up, then, the case law of this state recognizes that constitutional, statutory, and administrative provisions can articulate a fundamental and well defined public policy. Statutes rarely state the public policy underlying them in express terms. *Wandry*, 129 Wis. 2d at 42. Expressions of public policy can be implicit, and this court looks at the content of the provision to determine whether the spirit, if not the letter, speaks to a clear mandate of public interest. *Hausman*, 214 Wis. 2d at 664; *Bushko*, 134 Wis. 2d at 143–44.

¶ 48. In this case our inquiry therefore focuses on whether Strozinsky has identified a fundamental and well defined public policy in the spirit or the letter of constitutional, statutory, or administrative provisions sufficient to trigger the exception to the employment-at-will doctrine. Consistent with our precedent, this court interprets public policies narrowly. We do not deviate from the general tenets of the employment-at-will doctrine, and we do not apply public policy to diminish employer discretion in terminating at-will employees.

¶ 49. In her complaint, Strozinsky identified Wis. Stat. § 943.39 as the source of the well defined public policy, and she referred to her refusal to falsify payroll documentation and defraud "taxing authorities" as the reasons why the District forced her to terminate her employment.[13] This court construes the complaint liberally. *Wandry*, 129 Wis. 2d at 47.

¶ 50. Wisconsin Stat. § 943.39 provides:

> **Fraudulent writings.** Whoever, with intent to injure or defraud, does any of the following is guilty of a Class D felony:

---

[13] Strozinsky alleged in her complaint that Moe and Amundson ordered her to falsify Moe's "payroll documentation in an attempt to defraud the taxing authorities in violation of sec. 943.39, stats." Furthermore, she contended that she "was forced to terminate her employment. . .as a direct result of her refusal to violate the public policies established by sec. 943.39, stats., her refusal to falsify payroll documentation, and her refusal to defraud the taxing authorities." The complaint stated that the District wrongfully discharged her "in violation of the fundamental and well-defined mandates of public policy found at sec. 943.39, stats., which prohibit fraud through enforcement of criminal sanctions."

(1) Being a director, officer, manager, agent or employee of any corporation or limited liability company falsifies any record, account or other document belonging to that corporation or limited liability company by alteration, false entry or omission, or makes, circulates or publishes any written statement regarding the corporation or limited liability company which he or she knows is false.

The District argues that this statute has no force or effect "upon a mere clerical employee" and is "merely punitive in nature." Petitioner's Brief at 24, 27. We disagree. Section 943.39(1) prohibits the employees of corporations and limited liability companies from falsifying records, accounts, and documents. The statute is part of the Criminal Code, and it exposes violators to a criminal penalty. Wisconsin Stat. § 939.50(3)(d) explains that a Class D felony is punishable by a fine not to exceed $10,000, or imprisonment not to exceed five years, or both.

¶ 51. The public policy of proscribing false reporting in business dealings is fundamental and well defined. Section 943.39(1), both in letter and in spirit, deters fraud by threat of punishment. The statute expressly assigns a criminal penalty for falsifying records. The Criminal Code itself manifestly serves the public interest by seeking to eradicate criminal activity. Under this first step of the analysis, a showing that Strozinsky herself "intend[ed] to injure or defraud," contrary to Wis. Stat. § 943.39(1), is not necessary to identify a fundamental and well defined public policy. It is enough to demonstrate that the statutory provision evidences a fundamental and well defined public policy.

¶ 52. Strozinsky also identified her refusal to falsify records to federal tax authorities in her complaint.

In her brief, affidavits, and submissions of evidence in opposition to the District's motion for summary judgment, Strozinsky explained that Moe and Amundson's instructions exposed her to penalties under the Internal Revenue Code, namely 26 U.S.C. §§ 3101, 3102, and 6672(a) (1994).

¶ 53. Whether the public policy articulated·in federal statutes applies to this state's narrow public policy exception to the employment-at-will doctrine is a question of first impression. State courts in other jurisdictions identify fundamental and well defined public policies in various federal laws.[14] Those courts recognize that federal laws often speak to the "honest administration of public affairs." *Peterson v. Browning*, 832 P.2d 1280, 1283 (Utah 1992) (quotation omitted) (public policy exception applied to employee who refused to violate state tax law and federal customs regulations); *see also Russ v. Pension Consultants Co.*, 538 N.E.2d 693 (Ill. App. 1989) (public policy favoring obedience to federal law extended to employee who refused to falsify federal tax records).

¶ 54. Substantial public policy interests can reside in certain federal statutory provisions. Compliance with tax regulations is fundamental to the

[14] *Peterson*, 832 P.2d 1280 (employee refused to falsify federal tax and customs documents); *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100 (Colo. 1992) (public policy exception extended to employee who refused to violate federal statute that applied criminal sanctions for falsification of reports to federal agencies); *Sabine Pilot Serv., Inc. v. Hauck*, 687 S.W.2d 733 (Tex. 1985) (employee refused to violate federal water pollution laws); *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859 (Mo. Ct. App. 1985); *Tameny v. Atlantic Richfield Co.*, 610 P.2d 1330 (federal price fixing laws); *Harless*, 246 S.E.2d 270 (state and federal consumer protection laws).

operation of local, state, and federal government. Statutes governing taxation are national in scope and "strike at the heart of a citizen's social rights, duties and responsibilities." *Russ*, 538 N.E.2d at 697 (quoting *Palmateer v. International Harvester Co.*, 421 N.E.2d 876, 878–79 (Ill. 1981)); *see also Chism v. Mid-South Milling Co.*, 762 S.W.2d 552, 556 (Tenn. 1988). Like other states, Wisconsin has an interest in compliance with federal tax laws. Falsification of federal tax records can result in underpayment of state taxes because the Internal Revenue Code serves as the starting point for computing state income tax for both corporations and individuals. Wis. Stat. §§ 71.26(2) and 71.01(13); *Russ*, 538 N.E.2d at 697 (citations omitted). Moreover, "[t]he effect on the employee of having to choose between keeping his [or her] job or following the law. . .is the same regardless of the origin of the law." *Peterson*, 832 P.2d at 1283.

¶ 55. Section 3101 of the Internal Revenue Code establishes the rate of tax individuals must pay, based on the percentage of wages. Section 3102(a) provides that, "The tax imposed by section 3101 shall be collected by the employer of the taxpayer, by deducting the amount of the tax from the wages as and when paid." Section 3102(b) imposes liability for failure to withhold payroll taxes:

> Indemnification of employer.—Every employer required so to deduct the [social security] tax shall be liable for the payment of such tax, and shall be indemnified against the claims and demands of any person for the amount of any such payment made by such employer.

The enforcement provisions of 26 U.S.C. § 6672(a) hold others liable for failure to withhold as well:

50

General rule.—Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of tax evaded, or not collected, or not accounted for and paid over. No penalty shall be imposed under section 6653 or part II or subchapter A or chapter 68 for any offense to which this section is applicable.

This statute exposes the person responsible, as well as the employer, to its penalties. The District contends that § 6672(a) did not subject Strozinsky to sanctions because she was not a "responsible person" subject to personal liability under the statute: "Strozinsky merely typed the check. She did not sign it; she had no authority to set or change the amount of wages paid to any employee." Petitioner's Brief at 27–28.

¶ 56. Federal law treats the person with effective power to pay the tax as the "responsible person." *Howard v. United States*, 711 F.2d 729, 734 (5th Cir. 1983). Courts read the term "responsible person" expansively. *O'Callaghan v. United States*, 943 F. Supp. 320, 324 (S.D.N.Y. 1996) (citations omitted). An "employee with the power and authority. . .to direct the payment of the taxes is a responsible person within the meaning of section 6672." *Feist v. United States*, 607 F.2d 954, 960 (Ct. Cl. 1979).

¶ 57. In the responsible person analysis, the answer often pivots on whether the person had power to make tax payments in light of the enterprise's financial organization and decision-making structure. *O'Connor v. United States*, 956 F.2d 48, 51 (4th Cir. 1992). This is a fact-intensive inquiry; in some

instances, employees who perform the clerical functions of collecting and paying taxes are not responsible persons. *Feist*, 607 F.2d at 957, 960. Nonetheless, responsibility does not turn on one's role as an officer or employer but rather on "knowledge of the tax delinquency and authority over the decision to pay or not to pay the taxes which is at issue." *Mueller v. Nixon*, 470 F.2d 1348, 1350 (6th Cir. 1972). Thus, one can be a responsible person if he or she is in a position within the business to prevent the default from occurring. *United States v. Kim*, 111 F.3d 1351, 1362 (7th Cir. 1997) (quoting *Bowlen v. United States*, 956 F.2d 723, 728 (7th Cir. 1992)).

¶ 58. Furthermore, an individual who is otherwise a responsible person will not avoid liability if he or she only follows a supervisor's instructions. *Howard*, 711 F.2d at 733–34. An employee will be liable for the tax even if his or her superior demands noncompliance with the tax laws as a contingency for not being terminated. *Id.*

¶ 59. Wisconsin, like the federal courts, reads the term "responsible person" broadly. The person need not be an officer or other key employee because this state's penalty provision, Wis. Stat. § 71.83(1)(b)2, refers expansively to officers, employees, and "other responsible person[s]." Although the legislature has not defined "other responsible person," the Tax Appeals Commission gauges responsibility by examining whether the person had the actual or de facto authority to withhold, account for, or pay the taxes, the duty to pay the taxes, and whether the person intentionally breached that duty. *Noard v. DOR*, Wis. Tax. Rptr. (CCH) P. 400–401 (W.T.A.C. Dec. 18, 1998). Thus, an office manager who filed tax returns and made some payments could be held personally liable because she was fully apprised of

the company's tax problems. *Green v. DOR*, Wis. Tax Rptr. (CCH) P. 400–378 (W.T.A.C. July 3, 1998).

¶ 60. In this case, Strozinsky was more than a mere clerical employee. She was responsible for preparing the District's payroll at its central office. Among her other duties, she computed and made the federal and state tax withholdings for all payroll checks issued to the District's employees. Strozinsky submitted payments to the IRS; she was in a position to prevent any default from occurring. She had knowledge of the tax delinquency and the authority to pay or not pay the withholding tax. At her deposition, Strozinsky testified that she knew the withholding tax was due from Moe's bonus check, and the IRS advised her that she should pay the tax.

¶ 61. Based on the advice from the IRS and her membership in the American Payroll Association, Strozinsky believed she personally could be held liable for any taxes that she did not withhold properly from Moe's check. Although Superintendent Moe told Strozinsky she was just a payroll clerk without power or authority, he stated that it was her responsibility to handle the taxes and provide advice. Strozinsky's expert witness recognized that accountants and bookkeepers, persons with authority to withhold and remit taxes, can be penalized as responsible persons if they fail to withhold payroll tax. The expert, citing *Howard*, 711 F.2d 729, suggested that it is difficult to persuade the IRS that a person was not "responsible," even if he or she were functioning under the direction and control of a supervisor.

¶ 62. The District maintains that 26 U.S.C. §§ 3102(b) and 6672(a) merely establish rules and do not evince a broader policy for the public good. The District argues that Strozinsky identifies no funda-

mental and well defined public policy because, unlike the nursing home employee in *Hausman*, 214 Wis. 2d at 667–68, she was under no statutory, affirmative duty to report the alleged violations committed by Moe and Amundson. The District misreads *Hausman*. Our decision in *Hausman* recognized a narrow public policy exception for the statute requiring the reporting of nursing home abuse and neglect. *Hausman* does not require parties to identify an affirmative duty within a public policy; on the contrary, *Hausman* expressly rejected a generalized "whistle-blower" exception. 214 Wis. 2d at 667. As *Brockmeyer* and its progeny illustrate, fundamental and well defined public policies can reside in constitutional, statutory, and administrative provisions that express no affirmative duties.

¶ 63. Applying a narrow exception to the employment-at-will doctrine, we hold that Strozinsky has identified a fundamental and well defined public policy. The spirit and the letter of the tax laws are designed to ensure that parties file accurate tax information.

¶ 64. To date, this court has not departed from a narrow interpretation of the public policy exception to the employment-at-will doctrine, and we do not deviate from this accepted approach today. This conclusion opens no Pandora's Box for employment litigation. We do not believe that the legislature intended the employment-at-will doctrine to cloak the fundamental and well defined public policies evinced in criminal statutes or in the federal income tax laws. Moreover, we cannot presume that the legislature intended to condone the Hobson's choice of choosing between being fired or being exposed to criminal sanctions. In holding that Strozinsky's complaint adequately identified a funda-

mental and well defined public policy, this court preserves both the letter and the spirit of the statute and the federal tax code. We thereby maintain the legislative goal of balancing the public interest and the private interests of employers and employees.[15]

## CONSTRUCTIVE DISCHARGE

¶ 65. Having concluded that Strozinsky identified a fundamental and well defined public policy exception to the employment-at-will doctrine, we next consider whether Strozinsky's claim can proceed under the second step of the public policy exception to the employment-at-will doctrine. Usually, this second step requires a plaintiff to demonstrate that the termination violated a fundamental public policy. This presents a question of fact for the jury. *Kempfer*, 211 Wis. 2d at 114. That question, however, is not before the court. Rather, this case presents a threshold issue. The public policy exception to the employment-at-will doctrine requires a "discharge." *Brockmeyer*, 113 Wis. 2d at 573. Therefore, we must decide whether a cause arising from a resignation can be actionable as a wrongful discharge within the context of that narrow exception.

¶ 66. The District contends that a constructive discharge claim is not actionable because Strozinsky resigned voluntarily. Although Strozinsky conceded to the circuit court that constructive discharge does not constitute a distinct cause of action, she now asks this court to apply the constructive discharge doctrine to the element of "discharge" in a claim arising under the

---

[15] *See* Cluff, *In Defense of a Narrow Public Policy Exception,* at 449–50.

narrow public policy exception to the employment-at-will rule.

¶ 67. This second issue requires us to review the decision of the circuit court to dismiss the constructive discharge claim. This court reviews the dismissal of claims *de novo*. *Hausman*, 214 Wis. 2d at 662. We construe the complaint liberally and accept the facts presented as true. *Id*. Under this methodology, this court will uphold the dismissal of a claim "only if it is 'quite clear that under no conditions can the plaintiff recover.' " *Id*. at 663 (quotation omitted). Whether a claim is actionable also is a question of law that we review *de novo*. *Tatge*, 219 Wis. 2d at 105. Because this is an issue of first impression,[16] we turn to the persuasive authority from other jurisdictions in the course of this analysis.

¶ 68. The doctrine of constructive discharge recognizes that some resignations are coerced, tantamount to a termination.[17] Usually, employers do not "discharge" employees who resign: An employee can leave an at-will position at any time—for any reason or no reason at all—just as an employer can

---

[16] In *Winkelman v. Beloit Memorial Hospital*, 168 Wis. 2d 12, 18, 27, 483 N.W.2d 211 (1992), the employer hospital contended no discharge occurred because the nurse resigned. The jury found that the nurse's termination was not voluntary. The hospital did not challenge the jury's finding on appeal, and we therefore did not address it in our review of the case.

[17] Lex K. Larson, *Unjust Dismissal*, § 6.06[2] (1999) (quoting *Smith v. Brown-Forman Distillers Corp.*, 241 Cal. Rptr. 916, 920 (1987)); William J. Holloway & Michael J. Leech, *Employment Termination Rights and Remedies* 142 (1993). *See generally* Schulze, *Constructive Discharge of School Employees*, 118 Ed. Law Rep. 805.

terminate an at-will employee at its discretion. An employee who departs from the workplace generally cannot pursue a claim against the employer for wrongful discharge. Nonetheless, many courts reason that employers should not escape liability simply because the employer forced a resignation:[18]

> Actual discharge carries significant legal consequences for employers, including possible liability for wrongful discharge. In an attempt to avoid liability, an employer may refrain from actually firing an employee, preferring instead to engage in conduct causing him or her to quit. The doctrine of constructive discharge addresses such employer-attempted "end runs" around wrongful discharge and other claims requiring employer-initiated terminations of employment.

*Balmer v. Hawkeye Steel*, 604 N.W.2d 639, 641 (Iowa 2000) (quoting *Turner v. Anheuser-Busch, Inc.*, 876 P.2d 1022, 1025 (Cal. 1994), *criticized on other grounds, Romano v. Rockwell Int'l, Inc.*, 926 P.2d 1114 (Cal. 1996)). Constructive discharge exposes "what is ostensibly a resignation [as] a discharge." *Turner*, 876 P.2d at 1030. The doctrine operates "to discard form for substance, to reject sham for reality" and recognizes that certain resignations are, in fact, actual firings. *Beye v. Bureau of Nat'l Affairs*, 477 A.2d 1197, 1201 (Md. Ct. Spec. App. 1984); *see generally Marten Transport Ltd. v. DIHLR*, 176 Wis. 2d 1012, 1021–1025 (1993).

---

[18] Larson, *Unjust Dismissal*, § 6.06[2]. Stated otherwise, "[t]his approach invites employers to engage in subterfuge as a means of evading the law prohibiting retaliatory discharge." William J. Holloway & Michael J. Leech, *Employment Termination Rights and Remedies* at 142.

¶ 69. We agree with the decision of the circuit court that constructive discharge is not a generic, free-flowing cause of action. Other jurisdictions recognize that constructive discharge is not actionable by itself. *Turner*, 876 P.2d at 1030. Rather, the doctrine is ancillary to an underlying claim in which an express discharge otherwise would be actionable.[19] *Balmer*, 604 N.W.2d at 643; *Slack v. Kanawha County Hous. & Redev. Auth.*, 423 S.E.2d 547, 555 (W. Va. 1992). Constructive discharge joins the actionable claim and operates as a defense against an employer's contention that the employee quit voluntarily.[20] An employee who relies on a constructive discharge defense in a public policy exception case still must identify a fundamental and well defined public policy and then prove that the discharge, whether constructive or express, violated that policy. *See Seery v. Yale-New Haven Hosp.*, 554 A.2d 757, 761 (Conn. 1989). We therefore must determine whether the doctrine of constructive discharge can attach to a common-law claim based on the narrow public policy exception to the general rule of employment-at-will.

¶ 70. The concept of constructive discharge first arose in federal statutory claims brought under the

---

[19] In *Tennyson v. School Dist. of Menomonie Area*, 232 Wis. 2d 267, 606 N.W.2d 594 (Ct. App. 1999), for instance, the court of appeals analyzed constructive discharge in the context of a breach of contract claim.

[20] *Balmer v. Hawkeye Steel*, 604 N.W.2d 639, 643 (Ia. 2000); *Jacobson v. Parda Fed. Credit Union*, 577 N.W.2d 881, 882 (Mich. 1998); *Turner v. Anheuser-Busch, Inc.*, 32 Cal. Rptr. 2d 223, 231, 876 P.2d 1022, 1030 (Cal. 1994); *Vagts v. Perry Drug Stores, Inc.*, 516 N.W.2d 102, 104 (Mich. App. 1994); *Seery v. Yale-New Haven Hosp.*, 554 A.2d 757, 761 (Conn. 1989).

National Labor Relations Act. *See Balmer*, 604 N.W.2d at 641–42; *Turner*, 876 P.2d at 1026. In *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883 (1984), the United States Supreme Court addressed the discrimination some employers exerted against workers engaged in labor organizations. The Court observed that an employer discriminates "not only when. . .it directly dismisses an employee, but also when it purposefully creates working conditions so intolerable that the employee has no option but to resign—a so-called 'constructive discharge.' " *Id.* at 894. Federal courts allowed the constructive discharge defense in discrimination actions launched under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, and the Americans with Disabilities Act of 1990. *See Marten*, 176 Wis. 2d at 1021 (citing *Brooms v. Regal Tube Co.*, 881 F.2d 412 (7th Cir. 1989), *rev'd in part on other grounds, Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526 (7th Cir. 1993)); *Turner*, 876 P.2d at 1026; *Miranda v. Wisconsin Power & Light Co.*, 91 F.3d 1011 (7th Cir. 1996).

¶ 71. Outside the context of statutory claims, many courts now permit the constructive discharge defense in causes of action based on the public policy exception to the at-will employment doctrine and in other common-law claims.[21] Stated otherwise, these

[21] *Balmer*, 604 N.W.2d at 642 (citing *Reihmann v. Foerstner*, 375 N.W.2d 677, 683–84 (Iowa 1995)); *Collier v. Insignia Fin. Group*, 981 P.2d 321, 323 (Ok. 1999) (citing *Burk v. K-Mart Corp.*, 770 P.2d 24 (Ok. 1989); *GTE Products Corp. v. Stewart,* 653 N.E.2d 161, 168–70 (Mass. 1995); *Turner v. Anheuser-Busch, Inc.*, 32 Cal. Rptr. 2d 223, 876 P.2d 1022 (Cal. 1994); *Dalby v. Sisters of Providence in Oregon*, 865 P.2d 391, 394–95 (Or. Ct. App. 1993); *Slack v. Kanawha County Hous. & Redev. Auth.*, 423 S.E.2d 547, 558 (W. Va. 1992); *Sterling Drug,*

jurisdictions recognize that the concept of "constructive wrongful discharges" can arise in these claims. *See e.g., Turner*, 876 P.2d at 1030–31.

¶ 72. Although this court has not considered constructive discharge under the public policy exception to the employment-at-will doctrine, we have allowed parties to raise constructive discharge in termination proceedings brought under our civil service statute. *Watkins v. Milwaukee County Civil Serv. Comm'n*, 88 Wis. 2d 411, 276 N.W.2d 775 (1979); *see also Patterson v. Board of Regents of the Univ. of Wis. System*, 119 Wis. 2d 570, 587, 350 N.W.2d 612 (1984). This court recognized over 20 years ago that, "Resignation obtained by coercion poses serious possibilities of

743 S.W.2d 380; *Morris v. Hartford Courant Co.*, 513 A.2d 66 (Conn. 1986); *Beye v. Bureau of Nat'l Affairs*, 477 A.2d 1197, 1202–03 (Md. Ct. Spec. App. 1984); *Hunter v. Port Auth.*, 419 A.2d 631 (Pa. Super. Ct. 1980). *But see Bell v. Dynamite Foods*, 969 S.W.2d 847, 851–52 (Mo. Ct. App. 1998) (declining to address applicability of public policy exception to the employment at will doctrine after finding no discharge, actual or constructive); *Stroud v. VBFSB Holding Corp.*, 917 S.W.2d 75, 80–81 (Tex. App. 1996) (not reaching plaintiff's wrongful termination cause of action, although based on the public policy exception and alleging constructive discharge, because statute of limitations barred the claim); *Hinthorn v. Roland's of Bloomington*, 519 N.E.2d 909 (Ill. 1988) (expressly declining to rule on the viability of the constructive discharge theory because plaintiff alleged that she was actually, not constructively, discharged); *Grey v. First Nat'l Bank*, 523 N.E.2d 1138 (Ill. App. Ct. 1988) (finding no actionable constructive discharge in a retaliatory discharge tort claim—not a claim under the public policy exception to the employment-at-will doctrine—and reasoning that the facts did not indicate employee was told to resign). *See generally* Larson, *Unjust Dismissal*, § 6.06[2].

abuse. 'A separation by reason of a *coerced* resignation is, in substance, a discharge.' " *Watkins*, 88 Wis. 2d at 420 (citations omitted); *see also Patterson*, 119 Wis. 2d at 587; *Patterson v. Portch*, 853 F.2d 1399, 1406 (7th Cir. 1988). Ultimately, whether a resignation was voluntary is a question of fact reserved for the fact-finder. *See Watkins*, 88 Wis. 2d at 421.

¶ 73. Subsequently, this court acknowledged that constructive discharge can play a role in statutory discrimination claims, and we analyzed the doctrine alongside the WFEA, Wisconsin's counterpart to Title VII. *Marten*, 176 Wis. 2d at 1021–25. The rule in Wisconsin is "that an employee who voluntarily quits a position must show a constructive discharge to recover back pay and reinstatement under the WFEA." *Id.* at 1025. This approach implies a narrow application of the doctrine and treats constructive discharge exclusively as a defense in other claims.

¶ 74. Although *Marten* addressed constructive discharge, that case did not present the forum in which to address what an employee must prove to show constructive discharge.[22] Other jurisdictions have adopted tests that echo the language of the United States

---

[22] In *Marten Transport Ltd. v. DILHR*, 176 Wis. 2d 1012, 501 N.W.2d 391, 394 n.5 (1993), we declined to "define the test for determining whether an employer has constructively discharged an employee" because we accepted the finding in that case that the plaintiff quit voluntarily without being actually or constructively discharged. Recently, the court of appeals explored the theory of constructive discharge in the context of breach of contract. *See Tennyson*, 232 Wis. 2d 267. The *Tennyson* court applied the test from other jurisdictions, finding that the "law of constructive discharge [ ] recognizes that an employer may make working conditions so intolerable that an employee may reasonably feel compelled to resign." *Id.* at 281.

Supreme Court in *Sure-Tan*, 467 U.S. at 894: Federal courts agree that the trier of fact must be satisfied that "the employer made the working conditions so intolerable as to force a reasonable employee to leave." *Miranda v. Wisconsin Power & Light Co.*, 91 F.3d at 1017; *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977). This standard requires the employee to show that the employer knew or should have known about the intolerable conditions but permitted them to persist without remedy. *Turner*, 876 P.2d at 1027–28 (collecting cases). The requirement of knowledge minimizes the potential for uncontrolled litigation by ensuring that an employer implements corrective measures before the employee launches a lawsuit. *Id.* at 1028. The employee, however, is not obligated to prove that the employer intended to force a resignation. *Id.*; *see generally* Ralph H. Baxter, Jr. & John M. Farrell, *Constructive Discharge—When Quitting Means Getting Fired*, 7 Empl. Rel. L. J. 346, 348–52 (1981).

¶ 75. This court already has decided that it is appropriate to turn to federal case law when analyzing the theory of constructive discharge. *Marten*, 176 Wis. 2d at 1020. Other state courts have done the same and uniformly apply the standard set forth in federal decisions.[23] We join the other jurisdictions and decide that

---

[23] "There appears to be no disagreement [in the cases] that one of the essential elements of any constructive discharge claim is that the adverse working conditions must be so intolerable that any reasonable employee would resign rather than endure such conditions." *Turner*, 876 P.2d at 1027 (quoting *Slack*, 423 S.E.2d at 556). *See also Balmer*, 604 N.W.2d at 642; *Bell*, 969 S.W.2d at 851; *GTE Products*, 653 N.E.2d at 168–69; *Sterling Drug*, 743 S.W.2d at 385 (following *Brockmeyer*, 113

to raise the constructive discharge defense, the employee must establish conditions so intolerable that he or she felt compelled to resign. If the plaintiff cannot show that conditions so intolerable, the claim does not proceed. *Slack*, 423 S.E.2d at 556 (citations omitted).

¶ 76. We therefore must discern what conditions rise to this level of intolerability. A constructive discharge analysis implicates an objective inquiry, recognizing that employees cannot be overly sensitive to a working environment. *Brooms*, 881 F.2d at 423 (citing *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir. 1981)).[24] The question hinges on whether a reasonable person in the position of the plaintiff would feel forced to quit. *Rutan v. Republican Party of Illinois*, 868 F.2d 943, 950 (7th Cir. 1989) (en banc), *rev'd on other grounds*, 497 U.S. 62 (1990). Stressful "disappointments, and possibly some injustices" are not actionable. *Id.* Similarly, employees will not prevail in claims charging only that managers were heavy-handed, critical, or unpleasant. *Phaup v. Pepsi-Cola Gen. Bottlers*, 761 F. Supp. 555, 571 (N.D. Ill. 1991); *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993). Inferior work assignments, transfers to less favorable job duties, and substandard performance reviews alone generally do not create intolerable condi-

Wis. 2d 561, for its adoption of the public policy exception and then recognizing constructive discharge in a claim brought under the exception); *Seery*, 554 A.2d at 761; *Beye*, 477 A.2d at 1201–02 (collecting cases); *see* Larson, *Unjust Dismissal* at § 6.06[2]; *see also Tennyson*, 232 Wis. 2d at 281 (citing *Turner*, 876 P.2d at 1025).

[24] *See also Collier v. Insignia Fin. Group*, 981 P.2d 321, 324 (Ok. 1999); *GTE Prods.*, 653 N.E.2d at 168–70; *Turner*, 876 P.2d at 1027; *Slack*, 423 S.E.2d at 556; *Beye*, 477 A.2d at 1202 (collecting cases).

tions. *Id.*; *Marten*, 176 Wis. 2d at 1022 (citing *Alicea Rosado*, 562 F.2d 114); *Large v. Acme Eng'g & Mfg. Corp.*, 790 P.2d 1086, 1089 (Ok. 1990). Rather, the situation must be unusually aggravating and surpass "[s]ingle, trivial, or isolated" incidents of misconduct. *Turner*, 876 P.2d at 1027 (quotation omitted).

¶ 77. Criminal activity sometimes leads to intolerable conditions. The mere presence of illegal conduct at the workplace does not render the environment intolerable. *Id.* at 1032. Intolerable conditions can arise, however, when the employer requests or requires an employee to engage in illegal acts. *Smith v. Brown-Forman Distillers Corp.*, 241 Cal. Rptr. 916 (1987); *Turner*, 876 P.2d at 1032. In particular, requests that an employee participate in an unlawful enterprise, or repeated instances of illegality, may compel a reasonable person to resign. *Turner*, 876 P.2d at 1032. For instance, a constructive discharge defense is viable if an employee, who repeatedly violated federal and state liquor laws at the employer's instruction, subsequently refuses to participate further in the crimes and resigns. *Smith*, 241 Cal. Rptr. 916; *see also Jacobs v. Universal Development Corp.*, 62 Cal. Rptr. 2d 446, 451 (Ca. Ct. App. 1997). In this reasonability calculus, trial courts turn to the totality of the circumstances, taking into account the frequency of the conduct, its severity, and the remoteness of the illegal acts from the actual date of resignation. *Turner*, 876 P.2d at 1032; *Collier v. Insignia Fin. Group*, 981 P.2d 321, 324 (Ok. 1999); *GTE Prods. Corp. v. Stewart*, 653 N.E.2d 161, 168–70 (Mass. 1995). Thus, a resignation tendered five years after the illegality transpired is too remote to be actionable. *Turner*, 876 P.2d at 1032.

¶ 78. Constructive discharge ultimately presents a question of fact for the jury.[25] Strozinsky's departure may have been a termination, not a resignation. A jury could conclude that a reasonable person in the position of Strozinsky would be forced to resign because of intolerable conditions. We therefore find that it is not "quite clear that under no conditions can the plaintiff recover." *Hausman*, 214 Wis. 2d at 663 (quotation omitted).

¶ 79. There are facts indicating Strozinsky may have been forced to resign because of intolerable conditions. Moe and Amundson suggested Strozinsky might lose her job. Moe warned that she would be "out of here" and Amundson observed that "perhaps [Strozinsky] shouldn't be working here." Strozinsky summed up her reasons for leaving:

> I had been excluded and not talked to since I got back from my vacation. I had been told by Mr. Moe that if I didn't trust him I shouldn't work for them. And Mr. Amundson was telling me I was working for the wrong guy and suggested, perhaps, I work someplace else. And I was also threatened by Mr. Moe that I'd be out of there the next time I would do anything that would upset him. So, yes, I guess I did agree, and I didn't feel I had a choice.

¶ 80. Strozinsky presented testimony that Moe verbally abused her after she made the tax withholding from his regular paycheck. She explained that he appeared hostile, threatening, and verbally abusive.

[25] *Miranda v. Wisconsin Power & Light Co.*, 91 F.3d 1011, 1017–18 (7th Cir. 1996); *see also Watkins v. Milwaukee County Civil Serv.*, 88 Wis. 2d 411, 421, 276 N.W.2d 775 (1979) (noting that coerced resignation is a question of fact); *Sterling Drug*, 743 S.W.2d at 386.

She became physically sick after the confrontation with Moe. Following the August 3, 1995, meeting with Moe and Amundson, Strozinsky's work responsibilities diminished and Amundson and others ceased communicating with her. She contacted the IRS to confirm that the shortcomings in Moe's tax withholdings did not comply with federal law. She had learned from the IRS and American Payroll Association that she personally could be held liable for breaking tax laws. Strozinsky did not wait five years before departing; she resigned on September 13, 1995, approximately seven weeks after the July 20 incident.

¶ 81. A jury also could find that the District knew, or should have known, about Strozinsky's work conditions and failed to implement remedies. When Strozinsky submitted a written complaint to the human resources department, Amundson held it back and later stated that he would pretend he never saw it.

¶ 82. Taken together, the cumulative effect of these circumstances present a factual question about the nature of Strozinsky's discharge. We therefore hold that a jury should determine whether Strozinsky's resignation was voluntary or whether it constituted a constructive discharge.

¶ 83. This holding recognizes that employers cannot escape liability by coercing a resignation instead of formally uttering the words "you're fired." Were we to prohibit this cause of action because the employer forced a resignation instead of expressly discharging the employee, we would elevate form over substance and eviscerate the essence of *Brockmeyer* and its progeny. Nonetheless, we emphasize that a plaintiff's burden to prove constructive discharge is

stringent. The plaintiff must prevail under an objective standard, establishing that conditions were so intolerable that a reasonable person confronted with same circumstances would have been compelled to resign. The level of intolerability must be unusually aggravating and surpass isolated incidents of misconduct, injustice, or disappointment.

¶ 84. We caution that today's rule in no way broadens the narrow public policy exception to the employment-at-will doctrine. Our decision does not permit as expansive an application of the constructive discharge doctrine as allowed by some federal courts for statutory claims.[26] This court expressly declines to sanction a generic, free-flowing constructive discharge cause of action. All we hold is that plaintiffs can raise an ancillary constructive discharge defense in those causes of action under the public policy exception to the employment-at-will doctrine in which the employer alleges voluntary resignation. An employee who invokes the constructive discharge defense still must identify a fundamental and well defined public policy and then must prove that the discharge violated that policy.

¶ 85. We do not, and need not, address the second step of the analysis under the public policy exception to

---

[26] *Downey v Southern Natural Gas Co.*, 649 F.2d 302 (5th Cir. 1981) ("[e]ssentially, the test is whether a reasonable person in the employee's position would have felt compelled to resign. [The employee] asserts that his superior specifically advised him that he might be discharged, with a consequent loss of benefits. . . . A reasonable person might well feel compelled to resign in the face of such a statement."); *see also Slack*, 423 S.E.2d at 558; *Christensen v. Equitable Life Assurance Soc'y of the U.S.*, 767 F.2d 340, 343 (7th Cir. 1985).

the employment-at-will doctrine, namely whether Strozinsky sustained her burden to prove that, if there was a discharge, the discharge violated fundamental and well defined public policy. Like the threshold issue that asks if the resignation constituted a legal termination, resolution of this second step requires an answer from a fact-finder, not an appellate court.

## CONCLUSION

¶ 86.　We conclude that the decision of the circuit court should be reversed for two reasons. First, Strozinsky identified a fundamental and well defined public policy in her complaint, and therefore the District was not entitled to summary judgment as a matter of law. Second, dismissal of the complaint is inappropriate in this case because the doctrine of constructive discharge in certain circumstances can satisfy the element of "wrongful discharge" in claims arising under the public policy exception to the employment-at-will doctrine.

¶ 87.　Accordingly, the decision of the court of appeals is affirmed, and the matter is remanded to the circuit court for trial for a determination whether Strozinsky's resignation constituted a constructive discharge, and if so, whether the discharge violated fundamental and well defined public policy.

*By the Court.*—The decision of the court of appeals is affirmed.