**Joan FRYE, et al.**

v.

**ST. THOMAS HEALTH SERVICES, et al.**

Court of Appeals of Tennessee.
at Nashville.

Dec. 5, 2006 Session.

March 26, 2007.

598

P. Robert Philp, J., Brentwood, Tennessee, for the appellants, Joan Frye and John Frye.

Matthew C. Lonergan and Karyn C. Bryant, Nashville, Tennessee, for the appellees, St. Thomas Hospital, St. Thomas Health Services, Catherine Doyle, and Seton Corporation.

## OPINION

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

Employee and Husband filed action against hospital and other related persons and entities alleging various claims arising from employee's employment with hospital including claims for hostile work environment, age discrimination, constructive discharge, retaliation, wrongful discharge, and aiding and abetting. Hospital filed motion for summary judgment which was granted by the trial court, dismissing all of Plaintiffs' claims. Plaintiffs appealed. We affirm the decision of the trial court in all respects.

On May 7, 2001, Ms. Catherine Doyle, vice president of finance and controller at St. Thomas Hospital, hired Mrs. Joan Frye as the accounting services manager at St. Thomas. At the time of her employment, Mrs. Frye was fifty-four years old and Ms. Doyle was forty-one years old. However, Mrs. Frye did not develop a good working relationship with her immediate supervisor, Ms. Doyle. In addition to their poor working relationship, Mrs. Frye complained that Ms. Doyle engaged in the preferential treatment of younger employees by offering younger employees more pay, higher pay grades, more flexible hours, and increased social activity with Ms. Doyle. Mrs. Frye allegedly reported the preferential treatment to Ms. Doyle, Ms. Monica Shaw, human resources director at St. Thomas, and Mr. Ken Venuto, Ms. Doyle's supervisor and chief financial officer at St. Thomas.

On October 18, 2002, Mrs. Frye requested that Mr. Venuto transfer her to a lateral position.[1] Mr. Venuto suggested a position in decision support at Middle Tennessee Medical Center, a St. Thomas member hospital, however Mrs. Frye was not interested in the position. According to Mrs. Frye, on January 3, 2003, Mr. Venuto contemplated transferring her to a position at Baptist Hospital, another St. Thomas member hospital, at the controllership level doing special projects. However on January 6, 2003, Ms. Doyle returned from maternity leave and after learning of Mrs. Frye's request, advised Mr. Venuto that she agreed with the requested transfer due to their poor working relationship. Mrs. Frye claimed that on January 10, 2003, Ms. Doyle met with her and demanded that the transfer occur within two weeks and threatened that she had the authority to fire Mrs. Frye for "chemistry". On the same day, Mrs. Frye

1. At this time, Ms. Doyle was on maternity leave and had been since August 2002.

met with Mr. Venuto and advised him that she was prepared to begin work at Baptist immediately.

On January 16, 2003, Mr. Venuto offered Mrs. Frye a position managing the budget and reimbursement process as the manager of financial services at Baptist. Mrs. Frye accepted the transfer and began work at Baptist on February 3, 2003. Although Mr. Venuto transferred Mrs. Frye to a management position with the same salary, job grade, and benefit package, Mrs. Frye complained that her position was a demotion because she only had three direct reports instead of seven, she reported to the controller instead of the vice president of finance/controller, and her responsibilities were diminished and different. Instead, Mrs. Frye preferred the position at Baptist at the controllership level doing special projects as allegedly once contemplated by Mr. Venuto.

On August 6, 2003, Mrs. Frye began medical leave from Baptist pursuant to the Family and Medical Leave Act (FMLA) as a result of a physical and mental breakdown which was allegedly caused by the hostile work environment at St. Thomas. Mrs. Frye remained on FMLA leave for twelve weeks and then began general medical leave under hospital policy until March 13, 2004. On March 15, 2004, after seven months of medical leave and with no indication of return, Mrs. Frye was terminated.

On May 20, 2003, Mr. and Mrs. Frye filed an action against Defendants alleging various claims arising from Mrs. Frye's employment at St. Thomas. On February 2, 2005, the trial court dismissed several of Plaintiffs' claims, leaving Mrs. Frye's claims for (1) violations of the Tennessee Human Rights Act (THRA) including age discrimination, hostile work environment, and aiding and abetting; (2) constructive discharge; (3) wrongful discharge; (4)

breach of implied contract; (5) fraudulent misrepresentation; and (6) intentional and negligent infliction of emotional distress; and Mr. Frye's claim for loss of consortium. On September 14, 2005, the trial court granted Defendants' motion for summary judgment on Plaintiffs' remaining claims. Plaintiffs appeal claiming that the trial court erred in (1) denying the discovery of four St. Thomas employees' hard drives as well as St. Thomas' payroll and employment records; (2) dismissing Plaintiffs' hostile work environment claim; (3) dismissing Plaintiffs' age discrimination claim; (4) dismissing Plaintiffs' constructive discharge claim; (5) dismissing Plaintiffs' retaliation claim; (6) dismissing Plaintiffs' wrongful discharge claim; and (7) dismissing Plaintiffs' aiding and abetting claim.

## I. DISCOVERY

As an initial matter, Plaintiffs contend that the trial court erred in denying their discovery request for the hard drives of four St. Thomas employees and for St. Thomas' payroll and employment records. Decisions concerning pretrial discovery are matters well within the discretion of the trial court and thus are reviewed under an abuse of discretion standard. *Benton v. Snyder*, 825 S.W.2d 409, 416 (Tenn.1992). A trial court only abuses its discretion when it applies an incorrect legal standard or reaches a decision which is against logic or reasoning and which causes an injustice to the complaining party. *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn.2001).

On June 25, 2004, Plaintiffs filed a request for production which sought "Any and all documents relating to any correspondence or communication between you and any other persons, excluding counsel, regarding the facts and/or Plaintiffs' claims that are the subject of your defense

including but not limited to letters, memorandum and electronic mail messages, tape recordings, statements, etc." Although Defendants' counsel objected to the request on the grounds that the request was vague, ambiguous, and overly broad, Defendants produced the requested documents including Mrs. Frye's personnel file, written communication with Mrs. Frye, and emails relating to Mrs. Frye's request for transfer. However on February 4, 2005, Plaintiffs moved the court to compel Defendants to produce the hard drives from the computers of Ms. Shaw, Mr. Venuto, Mr. Glenn Carnathan, and Ms. Doyle so that an expert could review the hard drives in order to determine whether the hard drives contained any email to, from, or about Mrs. Frye. The trial court denied Plaintiffs' motion.

Tennessee Rule of Civil Procedure 34.01 states that "Any party may serve on any other party a request (1) to produce and permit the party making the request ... to inspect and copy, any designated documents ... which constitute or contain matters within the scope of Rule 26.02 and which are in the possession, custody or control of the party upon whom the request is served". Tennessee Rule of Civil Procedure 34.02 explains that "The request shall set forth the items to be inspected, either by individual item or by category, and describe each item and category with reasonable particularity."

Here, Plaintiffs' request for production filed on June 25, 2004, made no mention of Defendants' hard drives. However, Plaintiffs argue that the hard drives may have contained emails pertaining to Mrs. Frye's employment with St. Thomas and therefore their request encompassed the right to search the hard drives. We disagree. After Defendants provided Plaintiffs with the items specifically set forth in the request, Defendants were under no duty to relinquish materials which were not requested or which were not described with reasonable particularity. Since Plaintiffs failed to file a competent request which specifically sought Defendants' hard drives, we find that the trial court properly denied Plaintiffs' motion to compel.

Plaintiffs also failed to properly request St. Thomas' employment and payroll documents. On October 25, 2004, Plaintiffs' counsel sent a letter to Defendants' counsel scheduling and noticing the deposition of fifteen witnesses. The letter requested that Defendants bring "all documents and any other materials relating to [the witness'] relationship to Catherine Doyle during 2001–2003." Again, Plaintiffs neglected to file a proper request for production of this information with the court pursuant to Rule 34 of the Tennessee Rules of Civil Procedure. Furthermore, Plaintiffs' letter was sent to Defendants' counsel after the written discovery deadline established by the trial court. We therefore find no merit in Plaintiffs' alleged error.

## II. STANDARD OF REVIEW

Having found no error in the court's pretrial discovery decisions, we now address the court's decision to grant Defendants' motion for summary judgment. "[A] summary judgment should be granted only when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion-that the party seeking the summary judgment is entitled to a judgment as a matter of law." *Pendleton v. Mills*, 73 S.W.3d 115, 121 (Tenn.Ct.App.2001). The moving party must demonstrate that no genuine dispute of material fact exists, *Pendleton*, 73 S.W.3d at 121, by either affirmatively negating an essential element of the nonmoving party's claim or by establishing an affirmative defense that defeats the nonmoving party's claim. *Byrd v. Hall*, 847

S.W.2d 208, 215 (Tenn.1993). If the moving party satisfies the requirements of Tennessee Rule of Civil Procedure 56, the non-moving party bears the burden of demonstrating how these requirements have not been met either "(1) by pointing to evidence either overlooked or ignored by the moving party that creates a factual dispute, (2) by rehabilitating evidence challenged by the moving party, (3) by producing additional evidence that creates a material factual dispute, or (4) by submitting an affidavit in accordance with Tenn. R. Civ. P. 56.07 requesting additional time for discovery." *Pendleton*, 73 S.W.3d at 121.

In reviewing a grant of summary judgment, this Court reviews the record *de novo* with no presumption of correctness as to the trial court's determination. *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn.2001). We view the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in the nonmoving party's favor, and discard all countervailing evidence. *Shadrick v. Coker*, 963 S.W.2d 726, 731 (Tenn.1998).

### III. HOSTILE WORK ENVIRONMENT

 Plaintiffs first challenge the trial court's dismissal of their hostile work environment claim based on the finding that the hostile work environment at St. Thomas was not age discriminatory. Under the THRA, "[i]t is a discriminatory practice for an employer to ... discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's ... age." Tenn.Code Ann. § 4-21-401(a)(1). The Tennessee Supreme Court has recognized that the legislature's stated purpose in codifying the THRA was to prohibit discrimination in a manner consistent with the Federal Civil Rights Acts of 1964, 1968, and 1972. Tenn.Code Ann.

§ 4-21-101(a)(1). Accordingly, our analysis of Plaintiffs' hostile work environment claim is the same under both the THRA and Title VII of the Civil Rights Act. *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 31 (Tenn.1996).

 The United States Supreme Court has interpreted Title VII of the Civil Rights Act of 1964 as protecting individuals against hostile work environments. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (U.S.1986). To establish a hostile work environment claim, a plaintiff must show that (1) she belongs to a protected group; (2) she has been subject to unwelcome harassment; (3) the harassment must have been based on a protected characteristic of the employee, such as age; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such an environment under either a theory of vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir.2002). A hostile work environment claim is established upon proof of conduct that is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Sav. Bank, FSB*, 477 U.S. at 67, 106 S.Ct. 2399 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982)).

In this case, Mrs. Frye admittedly belongs to a protected group. However, despite the clear presence of hostility at St. Thomas resulting from Ms. Doyle's abrasive management style, we agree with the trial court that Plaintiffs failed to show that the work environment was age discriminatory.

 At the outset, it is necessary to point out that civil rights statutes do not

prohibit all verbal or physical harassment in the work place. It is only harassment because of one's age, race, sex or other protected class characteristic that is prohibited. *Oncale v. Sundowner Offshore Serv., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). It is necessary to distinguish between harassment and discriminatory harassment to insure that discrimination laws do not become a general civility code. *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 464 (6th Cir.2000). If there is harassment in the work place, the burden is on the plaintiff to establish that such harassment is based upon one's age, race, sex or other protected class characteristic that is prohibited by the civil rights statutes. The fact that a supervisor is mean, hard to get along with, overbearing, belligerent or otherwise hostile and abusive, does not violate civil rights statutes, unless as alleged by Plaintiff in this case such discriminatory animus is motivated by plaintiff's age. *Barnett v. Dep't of Veterans' Affairs,* 153 F.3d 338 (6th Cir.1998); *Morris v. Oldham County Fiscal Court,* 201 F.3d 784 (6th Cir.2000); *Crawford v. Medina Gen. Hosp.,* 96 F.3d 830 (6th Cir. 1996); *Spicer v. Beaman Bottling Co.,* No. 01A01–9406–CH–00260, 1995 WL 138857, at *4 (Tenn.Ct.App. Mar.31, 1995).

In her extensive deposition of February 11, 2004, Mrs. Frye testifies:

A. We've already talked about the St. Clair Dottin situation. I would like to talk a little bit about the two weeks between January the 10th and January the 24th, two of the worst weeks of my entire life.

Q. Okay.

A. Two weeks that I'm sure contributed to the condition that I have, severely. After being told that I was being fired for doing a good job—

Q. Now, I'm sorry?

A. By Ms. Doyle.

Q. Ms. Doyle told you you were being fired?

A. When she told me I was to go to Baptist, I was being fired from my accounting manager job. You can call it anything you want. You can call it transfer; you can call it moved; you can call it whatever you want, but I was fired for doing a good job.

Q. And I understand what you're saying.

A. Yeah.

Q. I want, though—I want, though, to understand that those were your words and those were not words that Ms. Doyle used?

A. She said, It's better than being fired. They were words she used.

Q. But she didn't say, I'm firing you or—

A. Her—

Q. She didn't say those words?

A. Her tone of voice was, if I could fire you, I would fire you.

Q. Her tone of voice?

A. Said that. If I could fire you—that Ken Venuto has stepped in here and is probably the only thing that is stopping me from firing you. I've done it before, I'll do it again. That was her attitude. I've fired Mike Homard. I've fired Carolyn King. I've fired, fired, fired.

In fact, early on in the acquisition when there were complaints from MTMC personnel and Baptist personnel about her harsh behavior, she sat there, I should fire them all, like they all worked for her. So fire is a very big word in her vocabulary. Hate and fire are two extrememly big words in her vocabulary.

Q. But while her tone of voice said to you, fire, she didn't use the word fire with you?

A. No, but my feeling, because that was my job that I was hired for, that I accepted the offer was that I was being terminated. You may not say fire, but I was terminated from that job that day for no cause except that woman didn't like me. That's the only reason. That's the only reason. She did not like me.

I was told, as I said before, that it would be all my idea; that she would have all that—we've been through all that.

Well, come Monday the 13th, she was busy with meetings and I was busy. She came to me late in the afternoon and because Ken had said he would get back to her and to me, I assume, have you heard from Ken. No, I haven't. So she went in her office and closed the door, and I have to assume she called Ken because I didn't know. She closed the door.

She came out and she said, Well, he said, go ahead; make the announcement. It was 4:45 in the afternoon and she called together the accounting and finance department at 4:45. Her anxiousness to make this announcement was unbelievable. A third of the staff was gone. They had earlier work times than that.

But she brought together those who were left, and brought us together and announced that I was transferring to Baptist; that I would be doing special projects for Mike Johns similar to Lisa Watts. And this is when Glen Gill said it is so nice that we promote from within. Yes, isn't that a really good thing, she said, we promote from within.

And I'm sitting there going, yeah, I'm being promoted. All right. I'm being terminated and sent to hell is what's happening, and on, and on, and on. This is the time when Connie Luckett yelled, This sucks.

A lot of my staff displayed tremendous unhappiness, displeasure, shock. They came up to me, did you know this was going to happen? No, I did not. What's your title going to be? I have no idea. What are you going to be doing? I have no idea. Where is your office going to be? I have no idea.

They knew pretty quickly this was not a transfer. I didn't go over and interview. I didn't go over seeking a job. This wasn't my idea. They're not dumb; they knew. They knew exactly what was happening.

So I worked—she only worked Monday, Wednesday, and Friday. That was Monday. On Wednesday, she was getting that paperwork ready for that transfer. And that's when Monika sent me an e-mail and said, Well, are you leaving? And she had no title for the job.

That's when I told her Ken was working on this. Ken and Monika, I assume, communicated, and Glenn Carnathan. Earlier in the year Glenn Carnathan had come to me because of comments I had made to Monika about harassment with Catherine. And he had come to me in December, came to my office and told me not to get frustrated and leave because Ken would probably do the right thing.

And that's all he would say. He was very veiled. He'd say, Just don't get frustrated and leave; just don't get frustrated and leave. And I said, Well, it's really hard to get anybody around here to believe what is going on. He said, Just wait; Ken is probably going to do the right thing. This was Glenn Carnathan.

Q. In December of 2002?

A. Two. This was a little earlier. And so I relied on that but—

Q. Well, let me ask you about that. Was there any discussion with you and Glenn about the nature of your frustration?

A. He did not talk about it. He had been e-mailed by Monika who I had discussed it with.

Q. He was e-mailed—

A. Monika had—

Q. —by Monika—

A. —e-mailed Glenn. And it was all tied up with the St. Clair issue and some of my concerns about Catherine. And then when this came along and she told me it had to be all my idea, and she announced it to everybody—she couldn't wait to get the paperwork ready. The paperwork was moving on the 15th so that she could post and put Gary Hearn in there.

Q. Okay. What you told me about your conversation with Glenn Carnathan in December of 2002, was that the extent of it?

A. That was pretty much the extent. It was very veiled.

Q. Do you know what Monika e-mailed to Glenn?

A. I have no idea. I have no idea as to the complete substance. I just know that she did e-mail him with my concerns.

Q. You know that from Monika or from Glenn?

A. From Monika.

Q. I'm sorry. I just wanted to finish that up. Okay. We'll go back to the paperwork.

A. Okay. Then back to the paperwork, I again talked to Monika about my concerns. And she—what was happening, the—I was in a complete state of shock. She expressed to me some things that she knew about Catherine Doyle.

Q. Was this a face-to-face meeting—

A. Absolutely.

Q. —with Monika—

A. Yeah.

Q. —on the 15th?

A. Yes.

Q. Okay. What specifically did—I guess when you're having this conversation with Monika on the 15th, tell me as best you can recall specifically what each of you said.

A. She e-mailed me and said, Are you leaving us? And I called her back and said, I need to speak with you for a few minutes. I didn't say yes or no, and she said she was available right then.

I went over there and we sat and we talked about Catherine Doyle, about some of her outrageous behaviors, about some dress issues she had, about the negative feelings around her. I asked why. I told her about how this had gone with Catherine telling me I had to leave and that it was to be my idea and I couldn't bad-mouth her. And I said, Why is Catherine still here? And she said because of her relationship with Tom Beeman.

Q. What outrageous behaviors did you discuss?

A. Catherine was reprimanded for wearing low-cut tops and high-cut skirts, and things like that, being a little too suggestive in her behavior and her talk.

Q. Did Monika tell you—

A. Uh-huh.

Q. —that Ms. Doyle had been reprimanded for her inappropriate—

A. Has been talked to.

Q. —dress?

A. Yes.

Q. Had been talked to about her dress?

A. Yes, specifically about her dress.

Monika also told me that—not to blame her for Catherine Doyle being hired because when Catherine was hired there were two candidates. One of them withdrew because he didn't like May Bennett. The other one left Catherine. Sam Coleman was then the vice-president over HR, and they hired Catherine without checking her references. And later when there were issues with Catherine's behavior, they checked her references and they turned out to be unfavorable.

Q. Who checked her references?

A. I have no idea.

Q. Who told you that her references turned out to be unfavorable?

A. Monika. Mr. Venuto had earlier—he had asked me numerous times over about her, when Kelly Mathis had complained about her, had asked me numerous time, should he check with human resources about Catherine. And every time I said yes. Well, he finally did when there were e-mails between Glenn, and Ken, and Monika.

He came to me and he told me, he said, I did go to HR. They told me way—much more than you did about her, and it's too bad because she is so bright.

Q. Were those Ken's exact words?

A. Exact words.

Q. Were there any further—or more elaboration?

A. (Witness shakes head from side to side.)

Q. What did you understand or did you have an understanding as to the nature of the unfavorable references?

A. Just unfavorable. I do know that Catherine has a horrible reputation in the hospital, that she is one of those people who is sweet up and rains a holy terror on those below; that unless you are within her little clique, which is only people in their 20s and 30s who are too inexperienced and too highly paid to ever question her, that you will be harassed, abused, and that there is always somebody that she hates.

Number one—and Mr. Venuto may be shocked by this, but when he was—before he became CFO at Saint Thomas, she was vocally and adamant that she hated him and wanted to do everything she possibly could to keep him from getting the CFO's job; reiterated to me numerous time that Tom Beeman had offered it to her and she turned it down; that she had—

One time I was in her office when Ken called and wanted some information on gross revenue, and she responded in a very disrespectful way telling him that that was stupid and why should she send him that; that that had nothing to do with anything. And I observed that with my own eyes. She hung up the phone and ranted and raved around there for several minutes before she responded to it.

She hated Nancy McAward. She absolutely hated Steve Broadwater. She hated Danuta. She hated Monika by Monika's own admission. And if Catherine hated you, you were treated with disrespect, you were treated with disdain like you were a nonperson. She would go around you. She would stomp on you. She would belittle you. She would make nasty comments. And let me tell you, this may shock you, but in a meeting with Stephanie Manis—at least Stephanie Manis—she called Nancy Anness, Nancy Anus and implied she was a lesbian.

Q. Who is Nancy Anness?

A. A director of Saint Thomas Hospital in the care of the poor side where she runs the clinic. She called her Nancy

Anus. I was appalled by the stuff that came out of that woman's mouth. She's filthy mouthed, she's disrespectful.

And she hated Evette White. Oh, my God. One of Tom Beeman's young blondes, oh, my God, she hated her big time.

Q. Hated—

A. Hated Evette White, one of his girl-friends.

THE COURT REPORTER: I'm sorry?

THE WITNESS: Evette White. I think E–V–E–T–T–E; isn't it?

MS. BRYANT: I'm not sure if it's Y or E, but—

THE WITNESS: I think it's E.

MS. BRYANT:—we can supply that.

THE WITNESS: Hated Evette White, made nasty comments about her. Continuous, continuous hate, continuous attempts to get rid of people. She was so angry at Steve Broadwater that she made sure he would not be on the audit any longer.

BY MS. BRYANT:

Q. Who is Steve—

A. This is her—

Q. —Broadwater?

A. This is her method of operation. He was a manager on the Saint Thomas audit. She disliked him so much—

Q. A Saint Thomas employee or an—

A. E & —

Q. —E & Y—

A. —Y.

Q. —employee?

A. Disliked him so much that she had him removed form the audit. She campaigned until he was removed from the audit.

Mrs. Frye ended her extensive discussion of harassment at the hands of Catherine Doyle by stating:

And I wouldn't be here today if it hadn't been for Catherine Doyle. I should be at work. I should be doing my job. I'm a good employee. I've always been a good employee. And if it had not been for Catherine Doyle and her harassing, demeaning, bullying, vicious, vile and vindictive behavior, I'd be at work, and I'd be contributing to Saint Thomas.

And I am just—I am devastated. I don't know if I'll ever work. I don't know if I'll ever go back again. I don't know when I'll return and it's because of Catherine Doyle and the people that have ratified and supported her in her vendetta against me for all this time because she is a weak and shame-faced child who cannot deal with her own inadequacies, who is threatened by anybody who knows anything she doesn't know.

According to the deposition of Mr. Venuto, Ms. Doyle dealt with all St. Thomas employees in her "intense" and "dominant" management style regardless of the age of the employee. Mr. Venuto testified:

Q: You refer to one of Catherine Doyle's management elements or styles as being intense?

A. Yes.

Q. And is another word of saying that, "in your face," so to speak? Well, what do you mean by intense?

A. "In your face" has a negative connotation. Intense has a positive connotation. Intense means reviewing, analyzing, and evaluating situations, circumstances, numbers, whatever they may be, to come up with a logical, rational, and systematic conclusion.

Q. Is her interaction with people, though, including peers and subordinates, how would you characterize that interaction?

A. Very definitive. Some cases dominant.

Q. What do you mean by "dominant"?

A. She knew what she wanted, she knew what was right, understood the details, and was very clear about communicating those details.

Q. And in some cases, I mean, a certain type of case, or does anything come to mind?

A. No, I would say that that was a characteristic that permeated her entire management style. She was very, and probably still is, definite about having good solid accurate information.

. . .

Q. Glenn Carnathan testified that Catherine Doyle can be abrupt and rude. Do you agree with that?

A. Not rude.

Q. Abrupt?

A. Can be.

Q. But not rude?

A. Not rude.

Q. Have you ever seen her—I think, I mean when you said that she was dominating, a dominating personality, what did you mean by that?

A. Someone who can dominate a situation, someone who's got a strong personality, someone who knows what they want and makes the case to get it.

Q. Have you ever seen her interact with a subordinate where was dominant in the interaction to where you're referring to?

A. I have seen her work with peers where she is dominant, not with subordinates.

Q. Such as who?

A. Management team at St. Thomas.

. . .

Q. Has Catherine Doyle ever been abrupt with you?

A. I'm sure she has.

Q. Has she ever been rude to you?

A. No.

Q. Can you give an example of how she's been abrupt with you?

A. Let's see. When we talk about how to format the performance improvement plan objectives, okay? She set-up a format and wanted to show it to me and she was abrupt in showing it to me in terms of how she wanted it done.

Q. And in what way was she abrupt?

A. Just trying to get her way, using the, using the dominant piece of her personality.

Mr. Carnathan, chief human resources officer at St. Thomas, also testified that Ms. Doyle's entire management style was "abrupt" and "rude". However like Mr. Venuto, Mr. Carnathan testified that Ms. Doyle's "hard-nosed" style was not age discriminatory but rather the way in which she worked with all employees. Mr. Carnathan testified:

Q. Do you recall—specifically in what way was it not a healthy, functioning, working relationship? In other words, did Ms. Frye tell you about intimidation by Ms. Doyle, for example?

A. My recollection is that it has to do with different styles.

Q. Different styles?

A. Uh-huh.

Q. In what way?

A. Different people.

Q. They're two different people, so you have different styles?

A. Right. They're different people, and Catherine is at times abrupt and rude, to the point. But I can't categorize

any observation that I've had with her as harassment.

Q. In other words, she's never harassed you personally?

. . .

A. No. Sorry.

Q. Has she ever been disrespectful to you or condescending?

A. She's been hard-nosed, you know, CPA who knows what she wants and will seek to get it. She's also shown she is capable of sitting back and evaluating an opinion other than hers, but she—I mean, she is a very focused person who knows what she wants to get and seeks to get it.

. . .

Q. You mentioned earlier that you knew that Catherine Doyle was—was rude and abrupt with people I believe you said—

A. Uh-huh.

Q. —is that right?

A. Uh-huh. Can be, yeah.

Q. Is that—have you seen that yourself, her—her treating people that way?

A. I—I've been in—in meetings where—I like to use the word "bulldog on the chew rag," you know, somebody who's really got—got a strong idea in their mind and goes after it. But I wouldn't—I wouldn't consider that other than just a personal style, and it's very abrupt, and can, you know, appear to be very rude to people at times.

■ The THRA only protects qualified individuals against a hostile work environment *if* the environment is discriminatory. Nothing in the record established that Ms. Doyle treated age-protected employees any differently than non-protected employees, rather, the testimony clearly showed that Ms. Doyle was an equal opportunity oppressor, using her intense, dominant, abrupt, rude, and hard-nosed management style on all St. Thomas employees. Disagreement with a management style alone, without evidence of a discriminatory intent or motive, no matter how disagreeable that style may be, is simply insufficient to warrant protection under the THRA. The Sixth Circuit has recognized that, "personal conflict does not equate with discriminatory animus," *Barnett,* 153 F.3d at 343; *see also Morris,* 201 F.3d at 791; *Crawford,* 96 F.3d at 836, and it has further emphasized that "it is important to distinguish between harassment and discriminatory harassment in order to 'ensure that Title VII does not become a general civility code.'" *Bowman,* 220 F.3d at 464. Since we can find no evidence of discriminatory conduct, we affirm the trial court's decision to grant Defendants summary judgment on Plaintiffs' hostile work environment claim.

## IV. AGE DISCRIMINATION

■ Plaintiffs next challenge the trial court's dismissal of their age discrimination claim based on the finding that Mrs. Frye's transfer did not amount an adverse employment action. Because the analytical framework and burden of proof for age discrimination claims bought under the THRA is the same as that used for claims brought under federal law, *Dennis v. White Way Cleaners, L.P.,* 119 S.W.3d 688, 693 (Tenn.Ct.App.2003), a plaintiff may prove a violation of the THRA through direct or circumstantial evidence. *Kline v. Tenn. Valley Auth.,* 128 F.3d 337, 348 (6th Cir.1997). Direct evidence of discrimination is evidence that if credited by the fact finder, would establish the existence of discriminatory intent underlying the employment action without any inferences or presumptions. *Carter v. City of Miami,* 870 F.2d 578, 581–82 (11th Cir.1989).

■ Since Plaintiffs offered no direct evidence that Mrs. Frye's transfer was age discriminatory, we analyze the issue under the framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (U.S. 1973). Under *McDonnell Douglas,* Plaintiffs bear the burden of establishing a *prima facie* case of age discrimination by showing that (1) Mrs. Frye was a member of a protected class; (2) Mrs. Frye was subject to an adverse employment action; (3) Mrs. Frye was qualified for the position; (4) Mrs. Frye was replaced by an individual outside the protected class. *Dennis,* 119 S.W.3d at 694. "If, and only if, the plaintiff establishes a *prima facie* case, then the defendant must proffer a legitimate, nondiscriminatory reason for its actions. If the defendant does so, the plaintiff must rebut this with evidence that the asserted nondiscriminatory reason is mere pretext for discrimination." *Trudeau v. Dep't of Labor and Workforce Dev.,* No. W2003–01920–COA–R3–CV, 2004 WL 2439404, at *3 (Tenn.Ct.App. Oct.26, 2004).

■ In reviewing the record, we agree with the trial court that Plaintiffs failed to establish a *prima facie* case of age discrimination because there is no evidence that Mrs. Frye was subject to discrimination because of her age nor was she subjected to an adverse employment action. An adverse employment action is "a material and adverse change in the terms and conditions of employment." *Barnes v. Goodyear Tire and Rubber Co.,* 48 S.W.3d 698, 707 (Tenn.2000). "The change must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Barnes,* 48 S.W.3d at 707. The Tennessee Supreme Court has provided a non-exhaustive list of adverse employment actions including: "termination of employment; demotion evidenced by a decrease in wage or salary, by a less distinguished title, or by a material loss of employment benefits; or a significant reduction of material responsibilities." *Barnes,* 48 S.W.3d at 707.

Plaintiffs assert that Mrs. Frye's transfer was a material and adverse change in the terms and conditions of her employment because she had only three direct reports instead of seven, she reported to the controller instead of the vice president of finance/controller, and her responsibilities were diminished and different. It was undisputed that Mr. Venuto transferred Mrs. Frye to a management position with the same salary, job grade, and benefit package. Although Mrs. Frye reported to the controller at Baptist instead of the vice president of finance/controller, the testimony showed that the structuring and staffing of the accounting and finance divisions of Baptist and St. Thomas were completely different. Mr. Venuto testified that despite the differences in Mrs. Frye's responsibilities, the responsibilities at Baptist were critical and comparable to those at St. Thomas. Mr. Venuto testified:

> Q. Do you consider the position that you transferred Joan Frye into at Baptist Hospital to be a demotion or a promotion for her?
>
> . . .
>
> A. Lateral. The function, the function of reimbursement to me is more critical than the accounting manager function and the ISFP is critical, but the positions are lateral, in my opinion.
>
> Q. Lateral in what sense?
>
> A. Lateral in job responsibilities.
>
> Q. In that the job responsibilities at St. Thomas were—
>
> . . .
>
> A. Different but comparable.
>
> Q. What does that mean?

A. It means at St. Thomas, Joan did not have reimbursement and she did not have ISFP. At Baptist, she had reimbursement and ISFP, along with oversight of charge subscription master and ISFP factors in the budget, very important piece of information for us. Big project.

Q. So is it fair to say she had more responsibility at Baptist Hospital than she did at St. Thomas Hospital?

A. In my opinion, given the coordination of cost reporting, I would say yes.

Q. Did she have significantly more responsibility?

A. Not significantly more, no.

. . .

Q. . . . . [T]he position that she was in at Baptist Hospital, in your mind, was more important than the position she had at St. Thomas, correct?

A. Comparable is what I used. The reimbursement piece of it, as that would evolve over time, could potentially become more important.

Q. Her responsibilities at Baptist were more critical than her responsibilities at St. Thomas Hospital?

A. They were different, okay because it involved the budget, the ISFP, and coordination of cost reporting.

Q. But you don't believe that there were more critical responsibilities for her at Baptist Hospital?

A. No, I can't say that.

Q. Did you make an effort to make the transfer of Joan Frye to Baptist Hospital lateral?

A. Make an effort?

Q. Right.

A. No, we didn't make an effort, that's what it was.

■ It has been noted that any lateral job transfer will result in changes to an employee's job responsibilities. *O'Neal v. City of Chicago*, 392 F.3d 909, 913 (7th Cir.2004). However, an alteration of job responsibilities or a mere inconvenience is insufficient to sustain an actionable age discrimination claim. *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir.2002). Defendants admit that Mrs. Frye's job responsibilities were altered as a result of her transfer, however, the record clearly showed that Mrs. Frye's responsibilities at Baptist were comparable, if not of greater importance, to those at St. Thomas. Mrs. Frye preference for a position at Baptist at the controllership level doing special projects is simply insufficient to create an age discrimination claim under the THRA since it is well established that "a purely subjective preference for one position over another" will not suffice. *See generally O'Neal*, 392 F.3d at 913.

Because we find that Plaintiffs failed to establish a *prima facie* case of age discrimination, under *McDonnell Douglas*, we need not reach whether Defendants can offer a legitimate, nondiscriminatory reason for their actions or whether Plaintiffs can rebut the proffered reason with evidence that the asserted nondiscriminatory reason is mere pretext for discrimination. *See Trudeau*, 2004 WL 2439404, at *3.

**V. CONSTRUCTIVE DISCHARGE**

■ Plaintiffs next challenge the trial court's dismissal of their claim for constructive discharge. The Tennessee Supreme Court has held that in order to establish a claim for constructive discharge, an employee must show that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person would resign her employment. *Campbell*, 919 S.W.2d at 34.

The doctrine of constructive discharge recognizes that some resignations are

coerced and that employers should not be permitted to escape liability simply because they forced an employee to resign. *Smith v. Brown–Forman Distillers Corp.*, 196 Cal.App.3d 503, 241 Cal.Rptr. 916, 920 (Cal.App.1987); *Strozinsky v. School Dist. of Brown Deer*, 237 Wis.2d 19, 614 N.W.2d 443, 461 (Wis.2000); William J. Holloway & Michael J. Leech, Employment Termination: Rights and Remedies 142 (2d ed. 1993) ("Holloway & Leech"); Lex K. Larson, Unjust Dismissal § 6.06[2] (1999). The doctrine disregards form and recognizes that some resignations, in substance, are actually terminations. *Beye v. Bureau of Nat'l Affairs*, 59 Md.App. 642, 477 A.2d 1197, 1201 (Md.App.1984).

Courts today recognize two varieties of constructive dismissal. Holloway & Leech, at 79; 2 Mark A. Rothstein, Employment Law § 8.7, at 256 (2d ed. 1999); Ralph H. Baxter, Jr. & John M. Farrell, *Constructive Discharge–When Quitting Means Getting Fired*, 7 Employee Rel. L.J. 346, 352–57 (1981). The first, and currently most frequently encountered, variety appears in the context of hostile work environment discrimination claims. In these cases, a constructive discharge arises when an employer permits a hostile working environment to render an employee's working conditions so intolerable that resignation is the employee's only reasonable alternative. *E.g., Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 34–35 (Tenn. 1996). . . .

The second variety of constructive discharge . . . involves the demotion of executive employees who have a position-specific contract. Professor Corbin points out that an employment contract may involve a position of dignity and privilege and that these contracts are breached when an employer reduces an employee to an inferior status. He observes that

[o]ne who has been hired to be superintendent or general sales manager would generally be justified in quitting if he [or she] is ordered to act as floorwalker or sales clerk, even though the salary is not reduced. Such an order would also frequently be held to be a wrongful discharge by the employer.

8 Catherine M.A. Mc Cauliff, Corbin on Contracts § 34.10, at 256 (Joseph M. Perillo ed., rev. ed.1999). Accordingly, when an employee with a position-specific employment contract resigns after the employer forces the employee to choose among demotion, termination, or resignation, the employer remains liable for breach of contract unless the facts clearly demonstrate a fairly bargained for release of the employer. *Kass v. Brown Boveri Corp.*, 199 N.J.Super. 42, 488 A.2d 242, 245 (N.J.Super.Ct.App.Div.1985).

*Walker v. City of Cookeville*, No. M2002–01441–COA–R3–CV, 2003 WL 21918625, at *7 (Tenn.Ct.App. Aug.12, 2003) (footnote omitted).

▆ In this case, Plaintiffs argue that Mrs. Frye was forced to resign her position at St. Thomas due to the progressively hostile work environment created by Ms. Doyle. However, the record clearly establishes that Mrs. Frye did not resign her position at St. Thomas, but rather at her own request, Mrs. Frye was transferred to a position at Baptist. Because we have already found that Mrs. Frye's transfer was lateral in nature since the transfer resulted in no material loss in pay, benefits, title, or responsibilities, we cannot say that the transfer amounted to a constructive discharge. "Barring unusual circumstances . . . a transfer at no loss of title, pay, or benefits does not amount to a constructive discharge or adverse employ-

ment action." *Darnell v. Campbell County Fiscal Ct.*, 731 F.Supp. 1309, 1313 (E.D.Ky.1990).

> [I]t is important to remember that the Age Discrimination in Employment Act is not intended to prevent employers from changing the job responsibilities of their 40 to 65 year old employees. Neither is the Act intended to give 40 to 65 year old employees the right to walk out and sue their employer because they dislike their changed job responsibilities. If the employee walks out, he can complain of discharge only if the offered or altered " 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir.1977)" *Bourque [v. Powell Electrical Manuf. Co.* 617 F.2d 61 (C.A.5 1980)], *supra*, at 119.

*Frazer v. KFC Nat'l Mgmt. Co.*, 491 F.Supp. 1099, 1105 (M.D.Ga.1980).

Because we have found that Mrs. Frye's altered working conditions were comparable to those at St. Thomas and in no way so difficult or unpleasant that a reasonable person would resign their employment, we find no error in the trial court's dismissal of Plaintiffs' constructive discharge claim.

## VI. RETALIATION

Plaintiffs also allege that the trial court erred in dismissing their retaliation claim because Mrs. Frye was discharged from her position at St. Thomas after she complained of disparate treatment to Ms. Doyle, Ms. Shaw, and Mr. Venuto. The THRA prohibits retaliation against an employee who "has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing." Tenn.Code Ann. § 4–21–301(1). In order a establish a

claim for retaliation, a plaintiff must show that (1) the plaintiff engaged in an activity protected by statute; (2) the defendant had knowledge of the plaintiff's exercise of protected activity; (3) the defendant thereafter took an employment action adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the adverse employment action. *Newsom v. Textron Aerostructures, a div. of Avco, Inc.*, 924 S.W.2d 87, 96 (Tenn.Ct.App. 1995). Because we have already found that Mrs. Frye's transfer did not amount to an adverse employment action, we find no error in the trial court's dismissal of Plaintiffs' retaliation claim.

## VII. WRONGFUL DISCHARGE

Plaintiffs next contend that the trial court erred in dismissing their wrongful discharge claim. A plaintiff may bring a cause of action for wrongful discharge under any statute that provides such a claim or under the common law of the state. *Clanton v. Cain–Sloan Co.*, 677 S.W.2d 441, 443–44 (Tenn.1984). Plaintiffs alleged in their second amended complaint that, "Defendants and each of them have at all relevant times wrongfully terminated Plaintiff Joan Frye's employment while she was completely disabled with mental injuries caused by the Defendants." Because Plaintiffs failed to allege a violation of a specific statute, such as the Americans with Disabilities Act (ADA) or the Tennessee Handicap Act (THA), codified at Tennessee Code Annotated section 8–50–103, we limit our analysis to whether Mrs. Frye's discharge was in violation of the common law.

While an employer is generally permitted to terminate an at-will employee for good cause, bad cause, or no cause at all; certain narrow exceptions apply where the employee attempts "to exercise a statutory or constitutional right" or where the

termination violates "a clear public policy which is evidenced by an unambiguous constitutional, statutory, or regulatory provision." *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 717 (Tenn.1997). "In order to state a claim for relief for this very exceptional ... action, the pleader must show clear violation of some well-defined and established public policy." *Chism v. Mid-South Milling Co., Inc.*, 762 S.W.2d 552, 556 (Tenn.1998).

■ In this case, Baptist terminated Mrs. Frye's employment after a seven month leave of absence and after Mrs. Frye failed to indicate whether she intended to return to work. Tennessee does not recognize a public policy against terminating a disabled employee after the employee has exceeded the available leave and where the disabled employee does not request an accommodation and fails to indicate a projected date of return. Rather, "[a]s a general matter, employees who do not return to work following a leave of absence are deemed to have left their employment voluntarily." *McPherson v. Stokes*, 954 S.W.2d 749, 751–52 (Tenn.Ct. App.1997). Accordingly, we find that the trial court committed no error in dismissing Plaintiffs' wrongful discharge claim.

## VIII. AIDING AND ABETTING

We also find that the trial court properly dismissed Plaintiffs' aiding and abetting claim. Pursuant to Tennessee Code Annotated section 4–21–301(2), "[i]t is a discriminatory practice for a person or for two (2) or more persons to: (2)[a]id, abet, incite, compel, or command a person to engage in any the acts or practices declared discriminatory by this chapter". Because we have already found that Defendants did not engage in any discriminatory conduct during the course of Mrs. Frye's employment, we affirm the action of the trial court.

## IX. RULE 13(B)

■ Plaintiffs also asserted in their complaint claims for breach of contract, fraudulent misrepresentation, intentional and negligent infliction of emotional distress, and loss of consortium, which were dismissed by the trial court following Defendants' motion for summary judgment. Although Plaintiffs failed to address these claims in their brief, they stated in their reply brief that this Court should nevertheless reverse the trial court's summary judgment and dismissal of these claims.

Tennessee Rule of Appellate Procedure 13(b) states that, "[r]eview generally will extend only to those issues presented for review." The advisory commission comments further explain, "Generally speaking, control over the issues should reside in the parties, not in the court. Accordingly, this subdivision provides that review will typically extend only to those issues set forth in the briefs." Because Plaintiffs failed to address these claims in their brief, we consider these issues waived on appeal.

## X. CONCLUSION

The voluminous record before the Court, when considered in the context of summary judgment, establishes that Mrs. Frye was a competent and effective employee of St. Thomas Hospital who had a most unpleasant relationship with Ms. Doyle, who hired her and was her immediate supervisor. This difficult relationship has obviously operated to the detriment of Mrs. Frye and contributed to disabling problems. There is, however, no substantial material evidence in the record that such hostility in the workplace was motivated by age discrimination and there is no evidence that the transfer sought by Mrs. Frye from St. Thomas to Baptist, in order to escape from Ms. Doyle, was anything than a lateral transfer to a comparable

position. The hostile work environment in which Mrs. Frye found herself was not discriminatory and provides no basis for her alleged causes of action. The judgment of the trial court is in all respects affirmed and costs of appeal are assessed to Appellants. The case is remanded to the trial court for such further proceedings as may be necessary.