PER CURIAM.
¶ 1 Connie Goss appeals a summary judgment granted in favor of Chippewa County (the County), her former employer. Goss brought claims against the County for wrongful discharge, breach of contract, and promissory estoppel after she resigned from her employment position. Goss contends the circuit court erred by concluding, as a matter of law, that she voluntarily resigned from her position and was not constructively discharged. We disagree and affirm.
BACKGROUND
¶ 2 The relevant facts are not disputed. Goss began working for the County in 1993 and was employed as the County's risk and purchasing manager from 1997 until 2014. In 2014, Goss and county finance director Dennis Hunt made allegations of misconduct in office against county administrator Frank Pascarella. Two independent investigations cleared Pascarella of the alleged misconduct. Pascarella subsequently fired Hunt and placed Goss on paid administrative leave. Six days after being placed on leave, Goss tendered her resignation.
¶ 3 Goss and Hunt's first allegation against Pascarella concerned certain representations Pascarella made to the County Executive Committee (the Committee) regarding the creation of a new position within the County administration. In mid-2014, the Committee met with Pascarella to discuss the feasibility of creating a human resources (HR) position, despite a similar proposal having failed to pass a Committee vote just a year prior. After that meeting, Pascarella prepared a memorandum that addressed the costs of funding the position. In his memorandum, Pascarella stated that "no additional levy would be required to sustain the [proposed HR generalist] position."
¶ 4 On August 26, 2014, Goss attended a meeting where Pascarella presented this memorandum to the Committee. In a deposition, Goss testified that Pascarella's statement regarding "no additional levy" concerned her. Goss explained that because she thought the HR generalist position would be a "tax levy position," Pascarella's statement "raised a concern that [the creation of the HR generalist position] would create a structural deficit in the budget." Accordingly, Goss approached Hunt and asked him if he could "figure out the fiscal."
¶ 5 Hunt investigated and concluded that, consistent with Goss's concerns and contrary to Pascarella's statement, an annual levy of $8036 would be needed to sustain the HR generalist position. Hunt communicated this conclusion in an email chain that included Pascarella and other members of the County's staff. Pascarella responded in the email chain, "I think if we show any levy increase to the position it undermines the initial credibility of the proposal," and he recommended that Hunt not "redefine the funding sources." After a face-to-face discussion with Pascarella and county human resources director Malayna Halvorson-Maes, Hunt ultimately signed a Personnel Administrative Change (PAC) form that omitted any language regarding a levy increase.[1] Shortly thereafter, the Committee unanimously voted to recommend that the county board approve the proposed HR generalist position.
¶ 6 On September 25, 2014, two days after the Committee approved that recommendation, Hunt met with county supervisor Anson Albarado. Hunt told Albarado he was concerned that Pascarella had not been truthful with the Committee about the real levy impact of the proposed new HR generalist position. Hunt also told Albarado about other, unrelated "ethical issues and financial concerns" he had regarding Pascarella. Hunt told Goss about his meeting with Albarado, which prompted Goss to contact Albarado. Goss told Albarado that, as a county supervisor, he was required by the County's ethics code to report the information he received from Hunt to the County's corporation counsel. Albarado then did so.
¶ 7 Approximately one week later, on October 2, 2014, Hunt sent an email to Michael Leisz, who, like Albarado, was a county supervisor. In his email, Hunt accused Pascarella of deceiving the Committee about the true financial impact of the HR generalist position on the county budget. Hunt quoted Pascarella as telling him "if the board knows the real levy impact of the position, they won't approve the position."
¶ 8 Goss and Hunt's second allegation against Pascarella arose from Pascarella's interactions with Lori Zwiefelhofer, an employee in Hunt's finance department. Zwiefelhofer approached Goss on October 2-i.e., the same day that Hunt emailed Leisz accusing Pascarella of lying to the Committee-and told Goss that Pascarella had requested to meet Zwiefelhofer outside of the County offices about issues "related to the budget." Zwiefelhofer testified in her deposition that she was not troubled by Pascarella's request, but "she knew that there were issues with [Hunt] and [Pascarella] ... and I didn't want to get involved." Nonetheless, she told Goss of Pascarella's comments because Goss "was close to my office." In an affidavit, Goss averred that, to her, Zwiefelhofer appeared "visibly shaken," and so Goss advised that Zwiefelhofer share her concerns with Hunt. Goss herself also contacted Hunt to tell him that Zwiefelhofer was "visibly upset."
¶ 9 Zwiefelhofer also spoke with Hunt, who responded by sending an email to the County's corporation counsel, James Sherman, and assistant corporation counsel, Todd Pauls. In his email, Hunt accused Pascarella of creating a "hostile work environment." Specifically, Hunt wrote that Zwiefelhofer had come to him and expressed that she was "very uncomfortable" because Pascarella had made "highly unusual requests" to meet with her outside of the office.
¶ 10 The Committee held a closed meeting to discuss the concerns raised by the allegations against Pascarella. At the meeting, the Committee authorized two separate, independent investigations to look into the claims.
¶ 11 On November 3, 2014, the investigation results were presented to both the Committee and Pascarella. Both investigations concluded that the allegations against Pascarella were without merit. The next day, Pascarella fired Hunt. He then called Goss into his office and placed her on indefinite, paid administrative leave. Goss asked why she was being placed on leave, but Pascarella declined to give her a reason. Instead, Pascarella gave Goss a letter that established the parameters of her leave, which included that she: (1) be available during work hours; (2) surrender her county-owned materials; (3) not act as a county employee; and (4) not contact any County employees or elected officials for work-related purposes.
¶ 12 Goss testified in her deposition that she understood Pascarella did not fire her. She stated that "[w]hat Mr. Pascarella indicated is that my position with the county would be evaluated after the budget hearings." Pascarella did not tell her that she was terminated, suspended, demoted or required to fulfill a corrective action plan. He did not eliminate her position. Goss's office and personal items were not boxed up, nor was she told she could not come into work again. Goss was eventually escorted from the building by a deputy sheriff, who was dressed in plain clothes.
¶ 13 On November 9, 2014, five days after being placed on paid administrative leave, Goss drafted a letter of resignation. The county sheriff, at Goss's request, escorted Goss to Pascarella's office to deliver her letter of resignation the following day. Pascarella formally accepted Goss's resignation in a letter he sent to Goss on November 13, 2014.
¶ 14 One day later, Chippewa County deputy sheriff William Gray was involved in a serious on-duty incident. As relevant here, Goss testified in her deposition that she learned that deputy Gray had been "stabbed and severely marred," a suspect had been "shot and killed," and there was significant damage to a squad car. Based on her experience, Goss testified she believed this incident would lead to "a number of items that would be involved in a liability claim, workers' comp[ensation] claim, and a property damage claim." Consequently, Goss returned to work the following Monday, November 17, 2014, to offer Pascarella her assistance in helping the County deal with these potential claims.
¶ 15 Goss testified that Pascarella appeared "shocked" to see her in the office, given her recent resignation. Goss explained to him that she was there to "offer[ ] ... up her services" in assisting with potential claims arising from the deputy Gray incident. Pascarella ultimately told Goss that her assistance would not be needed, and she did not return to work again.
¶ 16 On August 19, 2015, Goss filed this lawsuit against the County, asserting claims for wrongful discharge, breach of contract, and promissory estoppel. The County moved for summary judgment, arguing, as relevant here, that Goss's claims failed because she was not constructively discharged. The circuit court agreed, finding that Goss voluntarily resigned and was not constructively discharged. Accordingly, the court granted summary judgment in favor of the County. Goss now appeals.
DISCUSSION
¶ 17 We review a grant of summary judgment de novo, applying the same methodology as the circuit court. Mercer v. City of Fond du Lac , 2010 WI App 15, ¶ 8, 323 Wis. 2d 67, 780 N.W.2d 188 (2009). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2) (2015-16). A factual issue is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. Mercer , 323 Wis. 2d 67, ¶ 8.
¶ 18 Goss argues that a genuine issue of material fact exists as to whether the County unlawfully discharged her in retaliation for her involvement in the claims Hunt levied against Pascarella. In Wisconsin, courts adhere to the well-established doctrine of employment-at-will. Strozinsky v. School Dist. of Brown Deer , 2000 WI 97, ¶ 33, 237 Wis. 2d 19, 614 N.W.2d 443. This doctrine provides that, generally, when the terms of employment are indefinite, an employer may lawfully discharge an employee for good cause, no cause, or even for a morally wrong cause, without exposing itself to any potential liability. Id. Certain narrow exceptions to this potentially harsh doctrine have been crafted by both the legislature and the courts. Id. , ¶ 35. However, before a court may consider whether one of these narrow exceptions applies, an employee must first show that he or she was in fact discharged.[2] Id. , ¶ 68. This prerequisite is because an employee's voluntary resignation extinguishes any claims involving allegations of wrongful termination by an employer. Id.
¶ 19 In order to determine if an employee's resignation was in fact voluntary, we apply the constructive discharge doctrine. Id. This doctrine recognizes that when an employer effectively forces an employee to resign in an attempt to avoid a wrongful discharge claim, a seemingly voluntary resignation is tantamount to a termination and an otherwise barred claim may proceed. Mercer , 323 Wis. 2d 67, ¶ 11.
¶ 20 To show that a constructive discharge occurred, an employee must establish that his or her employment conditions were so intolerable that the employee felt compelled to resign. Strozinsky , 237 Wis. 2d 19, ¶ 75. This showing is made in the context of an objective inquiry as to whether workplace conditions rise to the level to support a finding of constructive discharge. Id. , ¶ 76. In other words, the employee must present sufficient evidence to show that a reasonable person in the employee's position would feel forced to quit. Id.
¶ 21 In performing our inquiry, we must recognize that an employee cannot be overly sensitive to a working environment. Id. It is not enough for an employee to allege that he or she suffered stressful disappointments or that a manager was heavy-handed, critical, or unpleasant. Id. Likewise, inferior work assignments, transfers to less favorable job duties, and substandard performance reviews are generally insufficient to make the requisite showing. Id. Instead, an employee must show that his or her work situation was "unusually aggravating." Id.
¶ 22 We agree with the County that Goss has failed to allege sufficient facts that would allow a jury to reasonably conclude that she was forced to resign because of an intolerable work environment. To the contrary, Goss's own actions-namely, returning to work and offering to assist the County in its response to the incident involving deputy Gray-plainly show that such an environment did not exist.[3] Based upon Goss's voluntary return to the workplace a mere seven days after turning in her letter of resignation, no reasonable factfinder could conclude that Goss felt her workplace was so intolerable that she was compelled to resign.
¶ 23 Goss does provide a "number of reasons" that influenced her decision to resign. However, none of her alleged reasons would lead a reasonable jury to conclude that the "unusually aggravating" conditions necessary to establish an intolerable work environment existed.
¶ 24 First, Goss argues that she knew "the budget hearings would be factored around potential misinformation." But Goss does not explain how the possibility that the budget hearings would involve "potential misinformation" created an intolerable work environment. Her argument also fails to acknowledge that, before she resigned, she knew that the Committee had commissioned and heard the results of an independent investigation as to whether any "potential misinformation" had been offered by Pascarella to the Committee. No reasonable factfinder could conclude that an employee's concern about "potential misinformation" created an intolerable work environment when an independent investigation was performed to determine whether the employee's concern was justified.
¶ 25 Second, Goss contends that the lack of any explanation for why she was placed on indefinite leave left her "sitting at home, waiting to be told she was fired." However, Goss's personal beliefs regarding her future employment status do not support a constructive discharge claim. See Mercer , 323 Wis. 2d 67, ¶ 16 ("[The plaintiff] did not stay with the City to see if or how his conditions of employment had changed. As a result, he cannot demonstrate that an inhospitable workplace drove him to resign."). Her personal beliefs also bear no nexus to the tolerability of her workplace conditions.
¶ 26 Third, Goss states that, based on Hunt's termination, she concluded "she was next" and resigned because "she did not want to lose accrued [Paid Time Off] benefits." Goss's statement, taken at face value, fails to support a constructive discharge claim because, again, it does not relate to her work environment. Moreover, her statement shows that her resignation was a calculated decision based on a potential loss of benefits. This context falls far short of showing the requisite coercion on the part of an employer that is necessary to sustain a constructive discharge claim. See id. , ¶ 15.
¶ 27 Finally, Goss invokes her subjective feelings of personal discomfort regarding her employment position. She states that the County's actions "damaged her professional reputation and credibility" because she was escorted from the building by law enforcement, and this event was written about in a local newspaper. Again, even viewing this assertion in the light most favorable to Goss, her argument does not show that her workplace conditions were intolerable. And, again, no reasonable jury could conclude her personal discomfort was so great that she felt she could not come into work, based upon the fact that she voluntarily did so just one week after resigning.
¶ 28 In sum, we conclude, as did the circuit court, that the County is entitled to summary judgment as a matter of law. Goss's claims all rest on her allegation that she was wrongfully terminated, but the undisputed facts show that Goss voluntary resigned her position with the County and was not constructively discharged. Consequently, all of Goss's claims fail. See Mercer , 323 Wis. 2d 67, ¶ 17 ("Without facts to support a constructive termination, [the plaintiff's] claims for mandamus, breach of contract and estoppel ... have no legal foundation.").
By the Court. -Order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5. (2015-16).

In a deposition, Hunt testified that a PAC form is "used to identify processes for hiring new employees, and whether or not they're going to be hired by creating a new position or filling a vacancy. So each time there's a hiring or reclassification there's a form filled out, and that's what the form is used for."

Because we ultimately conclude that Goss was not discharged, we do not address the parties' arguments regarding whether any exceptions to the at-will doctrine apply. See Turner v. Taylor , 2003 WI App 256, ¶ 1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716 (court of appeals need not address all issues raised by the parties if one is dispositive).

In her reply brief, Goss fails to address the County's argument that her return to work-after turning in her letter of resignation-was "dispositive proof" that she was not subjected to an intolerable workplace. Although we decide the issue on its merits, we note arguments not refuted may be deemed conceded. See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp. , 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979).